

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,883

**TYRONE CADE, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F11-33962-R
### IN THE 265TH JUDICIAL DISTRICT COURT
### DALLAS COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

In August 2012, a jury convicted Tyrone Cade, Appellant, of capital murder for stabbing his girlfriend and her teenaged daughter to death during the same criminal transaction or pursuant to the same scheme or course of conduct. TEX. PENAL CODE § 19.03(a)(7). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e)(1), the trial judge sentenced

Appellant to death. TEX. CODE CRIM. PROC. ART. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises forty-four points of error. After reviewing Appellant's claims, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence.

## I. FACTS OF THE OFFENSE

The jury heard evidence that Appellant and Mischell Fuller had been romantically involved for a number of years. They had also lived together in Fuller's house for several years. Appellant's eleven year-old daughter, Tyra Cade, and Fuller's seventeen-year-old daughter, Desaree Hoskins, lived with them. Desaree was Fuller's daughter with her ex-husband, Karlton Hoskins, who was in prison when Fuller and Appellant began dating. Michael Hoskins, Fuller's older child with Karlton, lived in Denton.

Although Appellant was still living in Fuller's house at the time of the killings, their relationship had deteriorated due to various factors. One factor was Karlton's 2009 release from a Florida prison, after which he began to reestablish a relationship with Michael and Desaree. Fuller greatly encouraged Karlton's efforts. Although Karlton lived in Florida, he became a presence in Fuller's and the children's lives. Appellant, who was jealous and possessive of Fuller, disliked her contact with Karlton. He suspected Fuller of rekindling a romantic relationship with Karlton and told her that he did not want her ex-husband to call the house. Even before Karlton's renewed presence, Fuller had repeatedly

---

[1]Unless otherwise stated, all future references to Articles are to the Texas Code of Criminal Procedure.

asked Appellant to move out. Appellant refused, and after one such request made shortly before the killings, threatened to burn the house down with Fuller in it. Although Fuller and Appellant still slept in the same bed, they had not been sexually intimate in several months.

The killings occurred sometime in the early hours of March 27, 2011. Later that day, Appellant turned himself in by calling 9-1-1 from a pay phone in a police station lobby. After receiving *Miranda*[2] warnings, Appellant gave officers video-recorded statements in which he confessed to the killings in detail. According to his statements, on the evening of March 26, 2011, he hid a recording device near Fuller's side of the bed, then went to a strip club with his cousin. After a few hours in the club, followed by an unsuccessful search for prostitutes, Appellant returned to Fuller's house around 2:00 a.m. The recording device had captured a Skype conversation between Fuller and Karlton, and Appellant listened to it when he returned home. Roughly two hours into the recording, Appellant heard the conversation become sexual in nature.

Soon thereafter, Appellant got into bed with Fuller, who fell asleep but was later awakened by Appellant's tossing and turning in bed. When Fuller told Appellant to lie down and go to sleep, Appellant showed Fuller a kitchen knife. Fuller began screaming when she saw the knife, and Appellant repeatedly stabbed her. Fuller's screams woke Desaree, who ran into the bedroom to help her mother. Appellant stabbed Desaree several times and then

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

returned to Fuller. When Desaree started to get up, Appellant stabbed her again multiple times as she screamed and attempted to crawl away from him. When Desaree stopped screaming and moving, Appellant walked back to Fuller, who was still alive and conscious. Appellant vaginally and anally raped Fuller, claiming that he ejaculated "[i]n her, on her, everywhere" because she made him feel like a sex offender.[3] Appellant believed Fuller lived for thirty to forty minutes after he first stabbed her, and he asserted that he sexually assaulted her for twenty to thirty minutes of that time. While he was sexually assaulting Fuller, Appellant heard Desaree speaking. He believed that Desaree survived longer than Fuller.

Officers found Fuller's body in the master bedroom, face down and naked below the waist. Fuller's buttocks and vaginal area were propped up on several pillows; a bottle of lubricant lay next to her body. Desaree's body was in the hallway, immediately outside the bedroom. In a bathroom, officers found a bloody knife and notebook containing Appellant's handwritten notes. Appellant wrote that Fuller had "kicked [him] to the curb" when she began trying to mend the relationship between Karlton and her children. Appellant also wrote that, because he could not live without Fuller, he took Fuller from himself and "from . . . anyone else." Although he expressed remorse for the killings,

---

[3]When Fuller and Appellant began dating, he was facing charges in Collin County for the 1999 aggravated sexual assault of Charity Trice. As we discuss in greater detail regarding point of error fifteen, a jury subsequently convicted Appellant of that offense. The convicting court sentenced him to a three-year term of community supervision that included a ninety-day jail term as a condition of community supervision. The community-supervision conditions also required Appellant to register as a sex offender and attend a sex-offender treatment program. After Appellant was terminated from his sex-offender treatment program, the convicting court revoked his community supervision and sentenced him to three years in prison.

Appellant also frequently deflected responsibility away from himself, writing, for example, "[Fuller] used to treat me so good. Not like a sex offender"; "I'm truly sorry, she drove me crazy trying to fix things with her kids and the father"; "I feel bad for so many people, especially who knew . . . [Fuller]. All I can say is she had a bad side . . . . It wasn't always sunshine"; and "Thank Karlton Hoskins for this one."

The medical examiner, Jill Urban, M.D., testified that Fuller died from being stabbed twenty-eight times. Urban found defensive wounds on Fuller's hands and wrists. Several wounds to Fuller's face, neck, and chest area were between four and five inches deep. Desaree's death resulted from thirty-nine stab wounds, many of which were also between four and five inches deep. Urban testified that the perpetrator used a great deal of force in inflicting Desaree's injuries, noting that the wounds penetrated her bones.

## II. INSANITY DEFENSE

In point of error seven, Appellant contends that the evidence of his insanity so greatly outweighed the State's contrary evidence when viewed in a neutral light that the verdict is manifestly unjust. We disagree.

Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. *See* TEX. PENAL CODE § 8.01(a). The relevant inquiry is whether, at the time of the charged conduct, and as the result of a severe mental disease or defect, the defendant did not know that his conduct was wrong. *See id.*; *see also Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008)

(noting that "wrong" in the Section 8.01 context means "illegal"). In reviewing a rejected affirmative defense such as insanity, we consider all of the evidence relevant to that defense in a neutral light. *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). Although the Court views the relevant evidence in a neutral light, we may not usurp the jury's function by substituting our judgment for the jury's assessment of witness credibility and the weight of the evidence. *Id.*

To support his insanity defense, Appellant offered lay testimony from his half-brother, Gregory Scott. Scott asserted that Appellant suffered from a severe mental defect and did not know his conduct was wrong when he killed Fuller and Desaree. Scott testified that he was four years older than Appellant and lived with Appellant, their mother, and Appellant's biological father, Jerry Cade Ford, until the age of six or seven. Scott, who asserted that he and Appellant came from a "crazy bloodline," testified that Ford had mental problems. After the age of six or seven, Scott lived with his grandparents. He had minimal contact with Appellant until they were both adults and their now-deceased mother became terminally ill. Scott testified that he and Appellant had difficult childhoods because their mother and Ford frequently abused each other in front of them. According to Scott, Appellant seemed different and emotionally unstable after serving a prison sentence for aggravated sexual assault. Scott also asserted that Appellant's mental state at the time of the offense was unstable, primarily due to chronic back pain that Appellant self-treated with pain patches. Scott admitted that he had

disliked Fuller and that he had suggested that Appellant place the recording device near her bed.

Appellant also presented testimony from three psychologists: Daniel Altman, Michael Gottlieb, and Gilda Kessner. Dr. Altman testified that he reviewed Ford's mental-health records, which showed that Ford had been diagnosed with schizophrenia and schizoaffective disorder. Altman told the jury that, based on heritability research and Ford's diagnoses, Appellant had a 9–18% risk of developing the characteristics of schizophrenia or schizoaffective disorder. On cross-examination, Altman acknowledged that he did not examine or purport to diagnose Appellant with schizophrenia or any other mental illness. He also stated that, in males, schizophrenia usually appears by a person's mid-twenties, and that it would be very unlikely for a thirty-eight-year-old male (Appellant's age at the time of the offense) to spontaneously develop schizophrenia. Moreover, according to Altman, the vast majority of people with mental illnesses, including schizophrenics, understand the difference between right and wrong.

Dr. Gottlieb testified that he learned through defense counsel of allegations that Appellant's mother and cousins sexually abused Appellant as a child. Gottlieb told the jury that some sexually abused children may develop psychological symptoms during adulthood. These symptoms can include internalizing and externalizing behavior, physiological symptoms, distorted perceptions as a result of their experiences, and other issues. However, the symptoms are nonspecific, meaning that they could originate from

something entirely unrelated to the earlier abuse, and there is no causal link between the earlier abuse and a particular psychological difficulty, if any, that subsequently develops. On cross-examination, Gottlieb acknowledged that he received no independent corroboration that the alleged sexual abuse actually occurred. And because he did not examine Appellant or review any of his records, Gottlieb also could not say whether Appellant actually manifested any psychological symptoms that might be consistent with childhood sexual abuse. Gottlieb further agreed that individuals who have been abused as children and develop psychological symptoms as adults are usually still able to conform their behavior to societal norms. Gottlieb offered no opinion concerning whether Appellant was insane at the time of the offense.

Defense counsel deposed Appellant's father, Ford, in anticipation of Appellant's capital-murder trial. Following Gottlieb's testimony, and in the jury's presence, counsel read a portion of Ford's deposition testimony into the record.[4] In that excerpt, Ford asserted that he discovered Appellant's mother performing fellatio on Appellant when Appellant was about two years old. Ford testified that he responded by hitting Appellant's mother in the head with a hammer and stated that Appellant witnessed him inflict the blow.

Dr. Kessner acknowledged that she worked exclusively for the defense in capital

---

[4]Over Appellant's objection, the trial judge excluded portions of Ford's videotaped deposition. Appellant proffered the entire deposition for purposes of appeal. The excluded portion indicates that Ford gave his testimony while hospitalized for a physical illness.

cases. Kessner testified about a mental condition she called "abandonment rage," which she acknowledged was not a diagnosis included in the American Psychiatric Association's Diagnostic and Statistical Manual. Kessner testified that a person experiencing "abandonment rage" exists in a state of autonomic arousal. She stated that such arousal limits cognitive processes and can cause an individual to lose control of his behavior. Kessner asserted that a person who is experiencing stressors such as depression, chronic pain, after-effects of childhood and adult trauma, and the threat of losing an intimate partner would be more likely to enter a state of "abandonment rage" than a person not subject to such stressors. She also asserted that an individual experiencing "abandonment rage" would not know, at the moment of violence, that his conduct was wrong. Kessner testified that there was a high probability that Appellant suffered from "abandonment rage." Kessner acknowledged, however, that she did not personally examine Appellant in preparation for her testimony.[5] Based on the information she reviewed, and after vacillating greatly, Kessner ultimately stated that is was her opinion that Appellant had a severe mental disease or defect at the time of the offense and did not know that his conduct was wrong.

In rebuttal, the State presented the testimony of Tim Proctor, Ph.D., a forensic psychologist. Dr. Proctor testified that he has worked as an expert witness for both the

---

[5]Kessner testified that she relied on the report prepared by the State's expert witness, Tim Proctor; the notebook found at the crime scene; some letters written by Appellant after the offense; conversations with defense counsel; and some professional literature.

State and the defense. Proctor also stated that he personally evaluated Appellant for over five hours and conducted a comprehensive record review. That review included records of the instant offense, including police reports, Appellant's 9-1-1 call, and Appellant's subsequent statements to police; the psychological evaluation conducted by mental-health staff at the jail immediately following Appellant's arrest; records of Appellant's mental-health treatment while awaiting trial; police, community supervision, and prison records associated with Appellant's prior arrests and convictions; Appellant's school, employment, and medical records; and the mental-health records of Appellant's father. Proctor testified that clinical notes reflected the staff's observations that Appellant misrepresented, exaggerated, or completely lied about his mental condition in order to be moved to a preferred-housing area. The notes further memorialized Appellant's admission that he cut his own wrist to make it look as if he were suicidal, so that jail officials would transfer him from the administrative-segregation housing unit.

Proctor told the jury that, before the offense, Appellant showed some depressive symptoms due to a back injury, but the symptoms did not rise to the level of a severe mental disease or defect or "anywhere close." Following the killings and Appellant's incarceration on capital-murder charges, psychological staff at the jail diagnosed Appellant with adjustment disorder with depressed mood and treated him with the lowest suggested therapeutic dose of a common antidepressant. Proctor described Appellant's depression as mild and stated that the adjustment disorder reflected Appellant's reaction to his current legal difficulties. Proctor also testified that neither of Appellant's current

diagnoses reached the level of a severe mental disease, and he opined that Appellant had no severe mental disease or defect at the time of the offense. Therefore, Proctor concluded, Appellant knew when he killed Fuller and Desaree that what he was doing was wrong.

After reviewing all of the relevant evidence in a neutral light, we cannot conclude that Appellant's evidence of insanity greatly outweighed the contrary evidence such that it renders the jury's determination manifestly unjust, conscience-shocking, or clearly biased. *Matlock*, 392 S.W.3d at 671. Point of error seven is overruled.

In point of error two, Appellant argues that the trial court erred by not admitting Ford's entire videotaped deposition into evidence over the State's relevance objection. *See* TEX. R. EVID. 401, 402. Appellant asserts that the excluded portion of the deposition, in which Ford discussed his own mental-health history, was relevant to Appellant's insanity defense. Appellant alleges that the trial judge's failure to admit Ford's entire deposition violated his Sixth Amendment right to due process by impeding his ability to present a complete defense. In point of error three, relying on the same arguments, Appellant alleges that the trial court erred by sustaining the State's relevance objection to the proposed testimony of Lilly Mae Ware, Ford's niece and caretaker.

When a trial court sustains the State's objection to the admission of a defendant's evidence, a federal due process violation may arise only if (1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or (2) the trial court's clearly erroneous ruling

results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense. *Easley v. State*, 424 S.W.3d 535, 540 (Tex. Crim. App. 2014) (quoting *Walters v. State*, 247 S.W.3d. 204, 219 (Tex. Crim. App. 2007)). Appellant does not contend that a state evidentiary rule categorically and arbitrarily prohibited him from offering the testimony at issue. Therefore, we consider only whether the trial court's rulings that excluded the remainder of Ford's deposition and Ware's proposed testimony were clearly erroneous and whether the excluded evidence was so vital to Appellant's insanity defense that its exclusion effectively prevented him from presenting that defense. *See id.*

In his excluded deposition testimony, Ford stated that he had been diagnosed with schizophrenia and bipolar disorder in his late twenties, he had been hospitalized many times due to those conditions, and he had been prescribed various psychiatric medications to treat his illnesses. Ford also described his disordered-thought processes and auditory and visual hallucinations. Ford testified that his parents had no history of mental illness and that none of his nine children had been diagnosed with any mental illness. Ware proposed to testify about the history and characteristics of Ford's mental illnesses and offer her opinion that six of Ford's children, including Appellant, had mental illness. But in her proffered testimony, Ware admitted that she was not trained to diagnose mental illnesses and had spent no significant time with Appellant.

Appellant is not entitled to relief. The trial court's rulings excluding the remainder of Ford's deposition and Ware's proposed testimony on relevance grounds were not an

abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Further, the trial court's rulings did not impede Appellant's ability to present his insanity defense. *See Easley*, 424 S.W.3d at 540. The issue central of Appellant's insanity defense was whether, at the time of the offense and as the result of a severe mental disease or defect, Appellant did not know that his conduct was wrong. The excluded testimony centered on Ford's mental health, not Appellant's. Appellant presented no evidence that, like Ford, he had been diagnosed with schizophrenia or bipolar disorder. In addition, the jury learned of Ford's mental-health history and diagnoses through other witnesses, including Appellant's half-brother and Dr. Altman. Points of error two and three are overruled.

In point of error four, Appellant alleges that the trial court abused its discretion by not allowing Dr. Antoinette McGarrahan, a forensic neuropsychologist, to testify at the guilt-innocence phase that Appellant exhibited symptoms of post-traumatic stress disorder (PTSD) and depression and that he scored in the borderline range of intellectual functioning.

The trial court held a hearing to determine the admissibility of McGarrahan's testimony. McGarrahan stated that she did not evaluate Appellant for insanity at the time of the offense and had no opinion on that issue. Based on her evaluation and testing of Appellant, McGarrahan planned to testify that Appellant had borderline-to-low-average intellectual functioning and exhibited some symptoms associated with depression and PTSD. McGarrahan stated that Appellant obtained an IQ score of 80 during her testing,

but she also stated that she had no opinion regarding whether Appellant's IQ rendered

him unable to understand that his conduct was wrong at the time of the offense.[6]

_____

[6]Although McGarrahan declined to render an opinion as to whether Appellant's IQ score of 80 allowed him to understand that his conduct was wrong at the time of the offense, she did make general statements with respect to a person with an IQ of approximately 80,

> [PROSECUTOR]: Okay. With respect to Mr. Cade's IQ being an 80 -- and that's what your testimony is; is that correct?
>
> [McGARRAHAN]: Yes, that's what he tested at.
>
> [PROSECUTOR]: Are you representing in your opinion that that is a severe mental disease or defect?
>
> [McGARRAHAN]: No, I'm not.
>
> [PROSECUTOR]: And is it your -- so that is not your opinion?
>
> [McGARRAHAN]: Correct.
>
> [PROSECUTOR]: Have you ever rendered an opinion saying that an IQ of 80 would be a severe mental disease or defect?
>
> [McGARRAHAN]: No.
>
> [PROSECUTOR]: Is a person with an IQ of 80 able to discern right from wrong?
>
> [McGARRAHAN]: Based solely on their intellect, yes.
>
> [PROSECUTOR]: So there's nothing with respect to his IQ that would relate to an opinion of yours that at the time of the offense he did or did not have a severe mental disease or defect or that he was or was not able to understand what he was doing was wrong?
>
> [McGARRAHAN]: Correct.
>
> [PROSECUTOR]: And with respect to mental retardation, you are in no way saying the defendant is mentally retarded, are you?
>
> [McGARRAHAN]: That's correct.

McGarrahan found that Appellant exhibited a depressed affect during her evaluation, but she did not know when the symptoms first appeared or whether they played a role in his commission of the offense. She also believed that it was possible that most of Appellant's depressive symptoms stemmed from the fact that he was incarcerated and facing capital-murder charges. McGarrahan additionally acknowledged that she did not actually diagnose Appellant with PTSD, she did not know when the PTSD-like symptoms first appeared, she could not exclude the possibility that his symptoms could be entirely due to his recent commission of a double homicide, and she did not know whether the symptoms played any role in his commission of the offense.

The trial judge's decision to exclude McGarrahan's testimony at the guilt-innocence phase due to lack of relevance fell well within the zone of reasonable disagreement. *Shuffield*, 189 S.W.3d at 793. McGarrahan had no opinion regarding whether Appellant was insane at the time of the killing—the purpose for which Appellant offered her testimony. *See Easley*, 424 S.W.3d at 540. Point of error four is overruled.

### III. SUFFICIENCY OF THE EVIDENCE—FUTURE DANGEROUSNESS

In point of error fifteen, Appellant contends that the evidence was insufficient to sustain the jury's affirmative answer to the future-dangerousness special issue. The future-dangerousness special issue requires the jury to determine "whether there is a

---

[PROSECUTOR]: Can you categorically say the defendant is not mentally retarded?

[McGARRAHAN]: Yes.

probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). When reviewing the legal sufficiency of the evidence supporting an affirmative answer to the future-dangerousness special issue, we review the evidence in the light most favorable to the verdict. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). Assessing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we determine whether any rational trier of fact could have believed beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Williams*, 273 S.W.3d. at 213.

Both the facts of the offense and other evidence showing Appellant's escalating pattern of violence and disrespect for the law were sufficient to support the jury's affirmative answer to the future-dangerousness special issue. *See Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005); *see also Devoe v. State*, 354 S.W.3d 457, 461–62 (Tex. Crim. App. 2011). Regarding the facts of the offense, we have recognized that a stabbing death is particularly brutal. *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997). "[A] knife is a weapon which by its very nature, forces the user to be in such close proximity to his victim that he is often touching him or comes into contact with him on each blow." *Id.* (quoting *Martinez v. State*, 924 S.W.2d 693, 696 (Tex. Crim. App. 1996)). Further, "the character of the weapon is such that several thrusts are often

utilized in order to ensure death—each additional thrust potentially indicating to any rational juror that such a personal act requires a wanton and callous disregard for human life." *Id.*

Here, the evidence showed that Appellant stabbed Fuller twenty-eight times and Desaree thirty-nine times, using great force to inflict deep, painful wounds. By Appellant's own estimate, Fuller and Desaree both had between thirty and forty minutes to experience the pain and terror of his attack before they died. For Fuller, this interval included a vaginal and anal sexual assault while she was dying but still conscious and able to experience pain and fear. While sexually assaulting Fuller, Appellant was aware that Desaree was still alive, within close proximity of her mother's ongoing sexual assault, and sufficiently conscious to speak. In short, the sheer brutality and depravity of the killings could convince a jury that Appellant poses a future danger to society. Even if the jury had been inclined to find that Appellant's conduct stemmed from an isolated incident of rage, it could have rationally concluded from the results that Appellant's "rage is of such an uncontrollable and extreme nature that he is a continuing danger to society." *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995).

But the jury also heard evidence concerning Appellant's prior criminal history, which included a 1987 juvenile adjudication of delinquent conduct for burglary of a habitation, evidence that Appellant committed aggravated assault with a deadly weapon when he shot a man named Edward Watts with a shotgun in 1993, and a 1999 conviction

for the aggravated sexual assault of Charity Trice. *See Young v. State*, 283 S.W.3d 854, 864 (Tex. Crim. App. 2009) (noting that evidence the defendant had previously committed aggravated sexual assault supported the jury's finding of future dangerousness); *King*, 953 S.W.2d at 271–72 (recognizing the commission of burglary of a habitation as evidence tending to show future dangerousness). Trice testified that, when she was twenty-one-years old, she met Appellant in a laundromat and exchanged numbers with him. Eventually, she invited Appellant to have drinks with her and her co-workers after work. Trice rode to the bar with a co-worker and was there for between one and two hours before asking Appellant to drive her home. Trice had a new apartment, was proud of it, and invited Appellant in to see it. After they talked for a bit, Trice went into her bedroom and closed the door to pack because she intended to stay the night at a friend's house.

As she went to the front door to leave her apartment, Appellant grabbed her arm and refused to let her leave. Trice testified that Appellant told her that he "wanted [her] pussy" and threw her to the ground. When Trice tried to fight him, Appellant told her, "Don't make me kill you like the last girl." Because Trice believed Appellant would kill her if she did not yield to his advances, she pretended to welcome the sexual contact and led Appellant into her bedroom to get him as far from the front door as possible so she could escape. In the bedroom, Appellant never let go of her wrist as he made her remove her clothing and then engaged in vaginal intercourse with her. Afterward, Appellant

forced Trice to stand over him as he performed oral sex on her.

The moment Trice felt she could safely escape, she wrapped herself in a blanket because she was naked and ran to a neighbor's apartment where she waited for police. Trice sustained injuries to her wrist, chin, hands, and forehead. Appellant had left the scene by the time police arrived, but he left a message on Trice's answering machine the next day apologizing for the previous night. Appellant was convicted by a jury and sentenced to three years' community supervision. As a condition of his community supervision, Appellant served ninety days in jail. He was also required to register as a sex offender and attend a sex-offender treatment program.

The jury also heard evidence of Appellant's behavior and attitude following his aggravated-sexual-assault conviction. Mercedes Sabal, Appellant's community-supervision officer for that offense, asserted that, while Appellant was incarcerated, he was critical of his past decisions and expressed willingness to adhere to his community-supervision conditions. However, following Appellant's release from jail, he "had an about face," told Sabal he would not adhere to the conditions, and denied his guilt, contending that Trice consented to their encounter.

Al Merchant led the sex-offender treatment program that Appellant was required to attend. Merchant testified that, during the initial assessment, he found Appellant to be extremely manipulative. Appellant denied having sexually assaulted Trice, asserting that he and Trice were engaged in consensual sex when her boyfriend or husband interrupted

them. Merchant testified that at the first group session, Appellant continued to maintain his innocence. Appellant also attempted to cry in front of the group, a behavior that Merchant surmised was not a genuine emotional response and further exemplified Appellant's willingness to try to manipulate people. Appellant skipped his second session. At his third session, which was ultimately his last session, Appellant was evasive, argumentative, disruptive, and manipulative. As a result, Merchant testified, he terminated Appellant from the program. In the discharge summary, Merchant wrote that Appellant's recidivism risk was extremely high.

Following Appellant's termination from the treatment program, the court revoked his community supervision and sentenced him to three years in prison. Appellant's disciplinary records while incarcerated showed that Appellant was found in possession of contraband and had an altercation with another inmate, during which Appellant suffered a black eye and the other inmate suffered a fractured thumb.

The jury additionally heard evidence that, in 1993, Appellant asked his cousin, Ashton Scott,[7] to help him confront a man named Edward Watts. When the two men found Watts, Watts pointed a gun at them and Ashton left. After someone later shot Watts in the back, police officers arrested Ashton for aggravated assault with a deadly weapon. After making bail, Ashton confronted Appellant, who admitted to shooting Watts with a shotgun. Ashton asked Appellant to confess to the police, but Appellant refused. The

---

[7]To distinguish him from Gregory Scott, we hereafter refer to Ashton Scott as "Ashton."

police eventually dropped the charges against Ashton, and no one was convicted for shooting Watts. Ashton also testified that, in 2002, Appellant hit their uncle in the face with a beer bottle during an altercation, and that his uncle bled profusely.

Bobbi Jo Klute dated Appellant off and on for a few years in the mid 1990s. Klute testified that, while they were dating, Appellant threw a beer bottle at her vehicle windshield after the two argued in her car. She also stated that, during a period that they were not dating, Klute was at her father's house with a male friend when Appellant kicked in the door, entered the living room, and assaulted Klute's friend. On another occasion, Klute and her son were visiting her son's father, and although Klute and Appellant were not dating at the time, Appellant showed up, knocked on the door, and asked her to leave with him. Klute did so to avoid a confrontation. Appellant sometimes told Klute that if he could not have her, no one could. Klute grew afraid of Appellant and tried to end their relationship permanently, but Appellant refused to accept the decision and harassed her for months. He would call Klute from a pay phone located near her house, follow her, and enter her home without her permission while she was away.

Viewed in the light most favorable to the verdict, the evidence was sufficient to support the jury's affirmative answer to the future-dangerousness special issue. Point of error fifteen is overruled.

### IV. REMAINING GUILT–INNOCENCE ALLEGATIONS

In point of error one, Appellant claims that the trial court erred by permitting

two witnesses to testify that, in March 2011, Fuller told them that Appellant had threatened her when she asked him to move out. Appellant contends that the testimony constituted inadmissible hearsay;[8] violated the Sixth Amendment's Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36, 42 (2004); and was unfairly prejudicial under Rule 403 of the Texas Rules of Evidence.[9] This point of error is multifarious because it is based on more than one legal theory. TEX. R. APP. P. 38.1; *Davis v. State*, 329 S.W.3d 798, 820 (Tex. Crim. App. 2010). However, we will review Appellant's allegations in the interest of justice.

The witnesses in question were Elena Belcher, Fuller's mother, and Sandra Hopkins, Fuller's friend. The trial court permitted Belcher to testify that, shortly before her death, Fuller said she was going to replace her smoke detector and install a house alarm because, when Fuller had asked Appellant to move out of her house, Appellant threatened to burn the house down with Fuller in it. The trial court allowed Hopkins to testify about a conversation with Fuller, during which Fuller made substantially similar statements to her.

---

[8]"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d).

[9]Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Unless otherwise stated, all future references to "Rules" refer to the Texas Rules of Evidence.

Even assuming that the trial court erred by overruling Appellant's hearsay and Rule 403 objections, the error did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). The evidence of Appellant's guilt was overwhelming without Belcher's and Hopkins's objected-to testimony. In addition, the relevant testimony did not materially weaken Appellant's affirmative defense of insanity. In short, the testimony did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

Appellant's Confrontation Clause argument also lacks merit. In *Crawford*, the Supreme Court held that the Confrontation Clause prohibits the admission of testimonial hearsay, and it stated that, at a minimum, the term "testimonial" applies to police interrogations and prior testimony at a preliminary hearing, before a grand jury, or at a former trial. *See Crawford*, 541 U.S. at 68; *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004). Accordingly, our threshold inquiry is whether the statements at issue were testimonial or nontestimonial. The record shows that Fuller's statements to Belcher and Hopkins were casual remarks that she made to her mother and a friend. We have previously determined that similar casual remarks to acquaintances are nontestimonial for *Crawford* purposes. *See Woods*, 152 S.W.3d at 114. Point of error one is overruled.

In point of error five, Appellant alleges that the trial court erred in admitting State's Exhibits 109–113 (crime scene photographs) over his Rule 403 objection. Appellant contends that the photographs were unfairly prejudicial because they were

graphic and in color, most showed Fuller's breasts and genitals, and the State had minimal need for the them. Appellant asserts that the sexual-assault evidence was not essential to the State's case because the indictment did not charge him with having murdered Fuller in the course of committing sexual assault.

The record shows that Appellant did not object to the admission of the photograph marked as State's Exhibit 111. Thus, Appellant did not preserve any alleged error for our review regarding that exhibit. *See* TEX. R. APP. P. 33.1.

Regarding the remaining exhibits, Rule 403 requires that a photograph possess some probative value and that its inflammatory nature not substantially outweigh that value. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). We review a trial court's admission of photographs over a Rule 403 objection for an abuse of discretion. *Id.* We examine several factors, including the photographs' probative value, their potential to impress the jury in some irrational and indelible way, the time needed to develop the evidence, and the proponent's need for the photographs. *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005). We also consider the number of photographs, their gruesomeness, their level of detail, their size, whether they are in color or black-and-white, whether they are close-ups, whether they depict a clothed or nude body, the availability of other means of proof, and other circumstances unique to the individual case. *Williams*, 301 S.W.3d at 690. When elements of a photograph are genuinely helpful to the jury in making its decision and the photograph's power "emanates from nothing

more than what the defendant himself has done[,] we cannot hold that the trial court has abused its discretion merely because it admitted the evidence." *Sonnier*, 913 S.W.2d at 519; *see Prible*, 175 S.W.3d at 734 n.20.

The record shows that police officers found Fuller's body lying face-down on the master bedroom floor and naked below the waist. A bottle of lubricant lay next to Fuller's body. Her buttocks and vaginal area were elevated by pillows. The photographs at issue are in color and measure roughly 8 ½ x 12 inches. They reflect Fuller's body as it appeared after forensic personnel lifted her shirt and rolled her body over to gauge the extent of her injuries. To the extent that Fuller's body is shown in these photographs, she is on her back and naked except for a shirt that is pulled above her breasts.

State's Exhibit 109 shows Fuller's face and body to the knees. There are stab wounds on Fuller's face, on the area between her breasts, on her right shoulder and upper chest area, and on her upper and lower right arm. A relatively small amount of blood is visible on Fuller's skin. Heavier blood stains appear on her shirt, the bedding material underneath her, and the adjacent carpet. A bottle of lubricant near the body is partially visible at the edge of the photograph. State's Exhibit 110 is a closer view of Fuller's torso, from her navel to just below her chin. Wounds on Fuller's right shoulder and upper arm are visible, but the focus of the photograph is a stab wound between Fuller's breasts. As in State's Exhibit 109, some blood is visible on Fuller's skin. The quantity of blood that stains Fuller's shirt is more apparent than in State's Exhibit 109. State's Exhibit 112

gives a close-up view of wounds on Fuller's right shoulder and upper chest area, right-upper arm, and right forearm. Fuller's left breast, the blood-stained shirt pulled above the breast, and a portion of her neck are visible. State's Exhibit 113 shows Fuller's body from the neck to the knees. Wounds to the area between her breasts and right arm are visible, as is blood on her skin and shirt. The photograph is taken from approximately the same distance but at a slightly different angle than State's Exhibit 109. The bottle of lubricant that was only partially visible in State's Exhibit 109 is fully visible in State's Exhibit 113.

The photographs showed evidence that was directly relevant to, and probative of, the charged offense. Besides showing Fuller's wounds, the photographs corroborated Appellant's statements to police and witness testimony concerning the crime scene. *See Prible*, 175 S.W.3d at 731. To the extent that the photographs were also probative of the sexual assault, they constituted same-transaction contextual evidence. *See id.* at 732 ("Same-transaction contextual evidence results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand.").

Further, the danger of unfair prejudice did not substantially outweigh the photographs' probative value. Whatever power the photographs possessed emanated primarily from what Appellant himself did. *See Sonnier*, 913 S.W.2d at 519. Under these circumstances, the trial court did not abuse its discretion by admitting State's Exhibits 109, 110, 112, and 113. Point of error five is overruled.

In point of error six, Appellant alleges that the trial court erred by refusing to give his proposed instruction on the lesser-included offense of murder:

> If all of you do not agree by a preponderance of the evidence that as a result of a severe mental disease or defect, the defendant did not know that his conduct was wrong when he intentionally or knowingly caused the death of [Fuller], but all of you agree that by preponderance of the evidence as a result of a severe mental disease or defect, the defendant did not know that his conduct was wrong when he intentionally or knowingly caused the death of [Desaree,] then you will find the defendant not guilty by reason of insanity as to the offense of capital murder [and] then you will consider whether the defendant is guilty of the offense of murder of [Fuller].

We apply a two-step analysis to determine whether the jury should receive a lesser-included offense instruction. *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013). First, we ask whether the lesser-included offense's elements are included within the proof necessary to establish the charged offense's elements. *Id.* at 162. If they are, we then inquire whether the record includes evidence that could allow a rational jury to find the defendant guilty of only the lesser-included offense. *Id.*; *see* Art. 37.09; *Feldman v. State*, 71 S.W.3d 738, 750–51 (Tex. Crim. App. 2002).

Appellant meets the first prong of the test; we have repeatedly held that murder is a lesser-included offense of capital murder. *See, e.g.*, *Smith v. State*, 297 S.W.3d 260, 275 (Tex. Crim. App. 2009). However, Appellant does not satisfy the second prong. Appellant points us to the general circumstances of the offense and his statements in which he professed an inability to explain why he killed Desaree. But as the State notes, this evidence suggests that Appellant lacked a motive to kill Desaree. It does not provide a

rational basis for finding that, due to a severe mental disease or defect, when Appellant stabbed Desaree thirty-nine times, he did not know that his conduct was wrong.

Further, the evidence does not support a finding that Appellant's state of mind when he killed Desaree was different from his state of mind when he killed Fuller. Dr. Proctor, the State's expert, testified that Appellant was sane during both killings. Appellant's expert, Dr. Kessner, opined that Appellant was insane during both killings because he was in a state of "abandonment rage" and autonomic arousal from the moment Fuller screamed (upon seeing Appellant in her bed with a knife) until "the violence stopped." For the jury to find Appellant guilty of the lesser-included offense, it would necessarily have to disregard both Proctor's and Kessner's testimony. It would have to find that Appellant was thinking rationally when he began to stab Fuller, but he then entered a state of autonomic arousal (i.e., became insane) when Desaree entered the bedroom, and he began stabbing her. He then regained rational thought when he stopped stabbing Desaree and returned to stabbing Fuller. Finally, he returned to a state of autonomic arousal (i.e., became insane again) when Desaree began to get up, and he stabbed her multiple additional times. In short, the evidence could not allow a rational jury to find Appellant guilty of only murder. *See Feldman*, 71 S.W.3d at 750–51. Point of error six is overruled.

## V. REMAINING PUNISHMENT-PHASE ALLEGATIONS

In points of error eight through ten, Appellant challenges the trial court's rulings excluding the punishment-phase testimony of his expert witnesses, Mark Vigen, Ph.D. (point of error 8) and Jonathan Sorensen, Ph.D. (point of error 9), and admitting the testimony of the State's expert, Travis Turner (point of error 10). Appellant alleges that the trial court should have permitted Vigen, a psychologist, to testify that there was a high probability that the Texas Department of Criminal Justice (TDCJ) could control Appellant if the jury sentenced him to life without parole. Next, Appellant asserts that the trial court should have allowed Sorensen, who holds a criminal-justice doctorate, to testify that individuals convicted of homicides involving intimate partners are less likely than other inmates to commit violence in prison. Finally, Appellant contends that the trial court should not have permitted Turner, a TDCJ classification officer, to testify about the types of weapons that prison inmates make.

The record shows that Turner first testified at a hearing outside the presence of the jury and later in the presence of the jury during the State's punishment case-in-chief. During the hearing outside the presence of the jury, Appellant objected on relevance grounds to Turner's proposed testimony about the kinds of inmate-made weapons he had encountered during his TDCJ career. Appellant argued that other inmates made the weapons in question, and that Appellant was not imprisoned when the discussed weapons were found. The trial court overruled the objection, and Turner was excused. Later, when the State recalled Turner in the presence of the jury, Turner testified about TDCJ's

inmate-classification system, living conditions and restrictions within each classification of inmate, the general kinds of violence and disciplinary infractions that sometimes occur in prison, and the kinds of weapons that inmates have made. Turner offered no testimony relating specifically to Appellant.

After the State rested its punishment case, Appellant called Johnny Lindsey to testify. Lindsey, who told the jury that he spent twenty-six years in TDCJ for aggravated sexual assault until being exonerated by DNA testing, testified about the prison environment. On cross-examination, without a defense objection, Lindsey stated that inmates commonly made and possessed shanks.

After Lindsey testified, the trial court held a hearing outside the jury's presence to determine the admissibility of testimony to be offered by defense witnesses S.O. Woods, Sorensen, and Vigen as experts. *See* TEX. R. EVID. 702. Woods, a retired TDCJ classifications officer, proposed to clarify aspects of Turner's testimony regarding TDCJ's inmate-classification system and ability to control inmates. After questioning Woods briefly, the State indicated that it did not object to his proposed testimony. Next, Sorensen stated that he proposed to testify that inmates convicted of intimate-partner homicides are less likely to commit acts of violence in prison than other inmates. The basis of Sorensen's opinion was his research, i.e., a study of TDCJ inmates convicted of capital murder, murder, or manslaughter that involved the killing of an intimate partner.

The trial court continued the hearing to allow Sorensen to retrieve a copy of his

research. In the meantime, the jury heard testimony from two defense witnesses, one of whom was Woods. On direct examination, Woods testified about TDCJ's inmate-classification system and ability to control inmates. On cross-examination, and without a defense objection, Woods testified that prison inmates are very creative and can fashion almost anything into a weapon, including shoe laces, combs, and handkerchiefs. Like Turner, Woods offered no testimony specifically related to Appellant.

When the hearing resumed, the State elicited testimony from Sorensen that his study was the first of its kind, incomplete, had not been peer reviewed or published, and no one had replicated his study's results. Sorensen acknowledged that, although successful peer review is some indication that a study "seems to look okay," replication of a study's results, rather than peer review, validates the study. At the end of Sorensen's hearing testimony, the trial court stated that it would review *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992), before deciding whether it would permit Sorensen to testify before the jury.

The trial court then heard from Vigen. Vigen stated that he had reviewed some offense and TDCJ records related to Appellant's conviction and imprisonment for aggravated sexual assault, but he had not personally examined him. Vigen proposed to testify that TDCJ "has a high probability of controlling individual inmates." He also stated that he based his opinion on thirty-five years of working as a psychologist in Texas prisons; five articles on prison violence written by other people including Sorensen;

Vigen's own co-authored article, in which he summarized research "indicating that a majority of death row inmates do not exhibit violence in prison even in more open institutional settings"; and Turner's and Woods's testimony before the jury. Although Vigen initially asserted that he would not offer an opinion specific to Appellant, he ultimately stated that he would testify that there was a high probability that TDCJ could control Appellant, in particular. When asked whether he based his opinion on anything individual to Appellant, Vigen acknowledged that he had not evaluated Appellant but noted that he had listened to Turner's and Woods's testimony.

The State objected to Vigen's proposed testimony. It argued that Vigen was not "qualified" to render an opinion about the probability that TDCJ could control Appellant because Vigen had reviewed very little information about the case, had not been present throughout the entire trial, and had not interviewed Appellant. Appellant countered that the State's argument concerned the weight to be given to Vigen's opinion, rather than Vigen's qualifications to render it. The trial judge ruled Vigen's testimony was inadmissible. After recessing to review *Kelly*, the trial judge also excluded Sorensen's testimony.

Rule 702 governs the admission of expert testimony. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). It states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education may testify thereto in the form of an opinion or otherwise." Rule 702. For evidence to be admissible under Rule 702, the proponent must demonstrate by clear and convincing evidence that the expert testimony is sufficiently reliable and relevant to assist the jury in reaching accurate results. *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).

Reliability in this context "refers to the scientific basis for the expert testimony." *Id.* (citing *Jordan v. State*, 928 S.W.2d 550, 553–54 (Tex. Crim. App. 1996)). Where, as in Appellant's case, the expertise involves a "soft" science,[10] the proponent may establish reliability by showing that (1) the field of expertise at issue is a legitimate one, (2) the subject matter of the expert's testimony falls within the scope of that field, and (3) the expert's testimony properly relies on or utilizes the principles involved in that field. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). In making its admissibility determination, the trial court may consider seven other factors that potentially affect reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained; (2) the testifying expert's qualifications; (3) the existence of literature supporting or rejecting the underlying scientific theory; (4) the technique's potential rate

---

[10] *Weatherred v. State*, 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000) ("The 'hard' sciences, areas in which precise measurement, calculation, and prediction are generally possible, include mathematics, physical science, earth science, and life science. The 'soft' sciences, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology.").

of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *State v. Medrano*, 127 S.W.3d 781, 784 n.4 (Tex. Crim. App. 2004).

"Relevance refers to the 'fit' of the scientific principles to the evidence at hand." *Everitt*, 407 S.W.3d at 263. "Relevance is a looser notion than reliability and is a simpler, more straightforward matter to establish." *Tillman*, 354 S.W.3d at 438 (internal quotation marks omitted); *see Jordan*, 928 S.W.2d at 555 (noting that expert testimony is relevant under Rule 702 if it will assist the trier of fact and is sufficiently tied to the facts of the case). Although relevance is the less demanding of the two required showings for admissibility under Rule 702, we have emphasized that the proponent will not always satisfy it. *See Jordan*, 928 S.W.2d at 555. "[T]he issue under the reliability and relevance conditions is whether the expert's testimony took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006) (internal quotation marks omitted).

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Tillman*, 354 S.W.3d at 435. We will not reverse if the trial court's decision falls within the zone of reasonable disagreement or is correct under any theory of law applicable to the case. *State v. Esparza*, 413 S.W.3d 81, 85 (Tex. Crim. App. 2013).

Appellant contends that the trial court should have permitted Vigen to testify about

TDCJ's ability to control Appellant because Vigen reviewed, and based his opinion on, Appellant's prison records, some offense reports concerning Appellant's aggravated-sexual-assault conviction, Woods's and Turner's testimony, and relevant research in his field. Alternatively, Appellant asserts that the trial court should have permitted Vigen to testify through answers to hypotheticals that Appellant would not be a future danger in prison.

To the extent Vigen proposed to testify about the probability that TDCJ could control Appellant, the trial court's ruling fell within the zone of reasonable disagreement. The record does not support Appellant's assertion that Vigen based his opinion on any information specific to Appellant. At the admissibility hearing, the State asked Vigen repeatedly about the bases for his opinion, and Vigen responded by listing his own experience, articles that were not specific to Appellant, and Turner's and Woods's testimony before the jury. Vigen did not include his review of Appellant's prison record and offense reports related to Appellant's aggravated-sexual-assault conviction as a basis for his opinions. Further, neither Turner nor Woods offered testimony specific to Appellant. The trial court did not abuse its discretion when it precluded Vigen from testifying about the probability that TDCJ could control Appellant.

To the extent Appellant argues that the trial court should have allowed Vigen to testify via hypotheticals that Appellant would not be a future danger in prison, the record does not show that Appellant suggested this alternative to the trial court. In responding to

the State's objection to Vigen's proposed testimony, defense counsel argued:

> Many times mental health professionals are given hypotheticals and asked to render opinions about future dangerousness and [sic] certainly qualifies within that category and meets the test of [*Nenno*] on the soft sciences that he's qualified to give an expert opinion. Any objection would go to the weight. There's no question about his qualifications and he's been qualified to testify in other death penalty cases [sic] the same or similar type of issues.

Although counsel mentioned the word "hypotheticals," it was in the context of an argument that the trial court should allow Vigen to testify that TDCJ would be able to control Appellant. The trial court cannot be fairly expected to have known from counsel's argument that, if the trial court did not allow Vigen to testify about TDCJ's ability to control Appellant, then Appellant wished to put Vigen on the stand to testify about Appellant's future dangerousness via hypotheticals. And when the trial court ruled that Vigen's testimony was inadmissible, Appellant did not seek clarification of the ruling's scope. To the extent he would have otherwise presented Vigen's testimony in the form of hypotheticals, Appellant failed to preserve any complaint. *See* TEX. R. APP. P. 33.1(a). Point of error eight is overruled.

Sorensen proposed to offer an opinion based on the results of a novel and incomplete study that had not been peer-reviewed, published, or replicated. The trial court acted within its discretion when it found Sorensen's testimony inadmissible under Rule 702. *See Coble*, 330 S.W.3d at 277–80; *Medrano*, 127 S.W.3d at 784 n.4. Point of error

nine is overruled.[11]

We do not reach the merits of point of error ten concerning the admission of Turner's testimony because, even if it was error for the trial court to admit Turner's testimony, Appellant was not harmed by that admission. "[W]hen a defendant offers the same testimony as that objected to, or the same evidence is introduced from another source, without objection, the defendant is not in position to complain on appeal." *See Hughes v. State*, 878 S.W.2d 142, 156 (Tex. Crim. App. 1992) (quoting *Stoker v. State*, 788 S.W.2d 1, 13 (Tex. Crim. App. 1989)). Although Appellant objected to Turner's testimony concerning weapons made by inmates, he did not object when Lindsey and Woods gave substantially the same testimony. Point of error ten is overruled.

In point of error eleven, Appellant argues that the trial court erred when it denied his request for a mistrial after Sabal, his former community-supervision officer, testified that he failed a polygraph while on community supervision for aggravated sexual assault. Although polygraph evidence is generally not admissible in Texas courts, the trial court did not abuse its discretion by denying Appellant's motion for mistrial. *See Ex parte Bryant*, 448 S.W.3d 29, 40 (Tex. Crim. App. 2014); *Leonard v. State*, 385 S.W.3d 570, 573 n.2 (Tex. Crim. App. 2012).

---

[11]In response to Appellant's eighth and ninth points of error, the State Prosecuting Attorney's Office has filed a postsubmission brief urging this Court to overrule *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007). The State Prosecuting Attorney argues that our holding in *Berry* is implicated by the question of whether the testimony of Drs. Vigen and Sorensen was relevant. We decline the invitation in this case because, as discussed above, this Court is able to resolve both points of error without deciding the relevancy issue.

Sabal's complained-of testimony occurred during the State's direct examination. Sabal testified that, following Appellant's termination from a mandatory sex-offender-treatment program, an arrest warrant issued, and the district attorney filed a motion to revoke Appellant's community supervision. He also asserted that Appellant knew that the termination endangered his community supervision and that Appellant acted "to extend his stay in the community." When the prosecutor asked Sabal to explain what she meant by that phrase, she answered,

> When a sex offender is unsuccessfully discharged from treatment[,] then we need to find another treatment provider that's going to accept that defendant into their program. That is not an easy thing to do once the offender has been discharged from treatment, especially for the reasons [Appellant] was discharged. . . . [I]t was difficult to find sex offender treatment providers who would accept an offender who was discharged because [he was] denying the offense for which [he] was placed on [community supervision] and had failed a polygraph.

The defense objected, arguing that Sabal's statement about the polygraph was irrelevant and highly prejudicial. The trial court sustained the objection and instructed the jury to disregard the statement, but it denied Appellant's subsequent request for a mistrial. The record reveals no further reference to the polygraph result by either party.

We review a trial court's denial of a motion for mistrial for an abuse of discretion, and will uphold the ruling if it falls within the zone of reasonable disagreement. *Coble*, 330 S.W.3d at 292. Here, the alleged grounds for mistrial arose from Sabal's apparently unanticipated answer to the State's question. This scenario is most closely aligned with cases in which a bystander or witness made a spontaneous outburst that interfered with

the normal proceedings of a trial. *See, e.g.*, *id*. at 291–92; *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *see also Williams v. State*, 643 S.W.2d 136, 138 (Tex. Crim. App. 1982) (discussing a State witness's unresponsive answer, which inadvertently placed information prejudicial to the defendant before the jury). In those instances, we held that the denial of a motion for mistrial would not result in reversible error unless the defendant showed the existence of a reasonable probability that the outburst interfered with the jury's verdict. *Coble*, 330 S.W.3d at 292 (citing *Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988) (op. on reh'g)). In the context of bystander or witness outbursts, we generally consider a trial court's instructions to disregard sufficient to cure the impropriety because we presume that the jury will follow those instructions. *Coble*, 330 S.W.3d at 292; *see also Williams*, 643 S.W.2d at 138 (noting the general rule that an instruction to disregard is sufficient to cure prejudice from a nonresponsive answer given by a State's witness).

Appellant argues that we should not apply our normal presumption concerning the sufficiency of an instruction to disregard because Sabal disclosed the results of the polygraph, as well as the fact that Appellant took such a test. In support, Appellant relies on *Robinson v. State*, 550 S.W.2d 54, 59–61 (Tex. Crim. App. 1977), *Nichols v. State*, 378 S.W.2d 335, 338 (Tex. Crim. App. 1964), and *Jones v. State*, 680 S.W.2d 499, 502 (Tex. App.—Austin 1983, no pet.). He contends that these cases stand for the proposition that an instruction to disregard is insufficient to cure harm when the jury learns of a

polygraph's results. Relying on *United States v. Murray*, 784 F.2d 188 (6th Cir. 1986), Appellant also asserts that we should not apply the presumption because we should consider Sabal a government agent who referred to the polygraph's result in bad faith. However, all of the cases upon which Appellant relies are distinguishable.

In *Robinson* and *Nichols*, the prosecution bolstered the testimony of key guilt-innocence phase witnesses concerning the charged offense. *Robinson*, 550 S.W.2d at 59 (stating that the accomplice-witness's testimony was vital to the State's capital-murder prosecution); *Nichols*, 378 S.W.2d at 336 (noting that the State's statutory-rape case depended entirely on the 14-year-old complainant's testimony). The prosecution did so in *Nichols* by asking the victim if she had taken a polygraph and in *Robinson* by repeatedly eliciting testimony that these witnesses had taken, and passed, polygraphs regarding their accounts of the charged offense. *See Robinson*, 550 S.W.2d at 56–59; *Nichols*, 378 S.W.2d at 336–37. In *Jones*, the prosecution impeached the defendant's punishment-phase testimony, in which she asserted that she killed the victim accidentally. *Jones*, 680 S.W.2d at 500–01. It did so by obtaining the defendant's admission on cross-examination that she had taken a polygraph and lied in response to several questions. *Id.* at 502. The State also elicited testimony through another witness that the polygraph examiner believed the defendant had lied when she denied her part in the murder. *Id.* In *Murray*, an experienced FBI agent who investigated the defendant for mail fraud testified at the guilt-innocence phase of the defendant's later trial on those charges. *See Murray*, 784 F.2d at

188. During his testimony, the agent referred to the fact that the defendant had taken a polygraph regarding the charged offense. *Id.* The panel majority found that the agent's reference to the test was deliberate and that the trial court's instruction to disregard the comment was inadequate to cure the error. *Id.* at 188–89.

In Appellant's case, the record does not support a finding that the prosecutor's question was designed to elicit testimony concerning the polygraph or that the prosecutor could have reasonably anticipated the reference. Further, the record shows that the prosecutor did not mention the polygraph or result after Sabal's fleeting reference. In addition, Sabal's reference occurred during the punishment phase, when the potential for prejudice was less than if it had occurred at the guilt-innocence phase. *See Coble*, 330 S.W.3d at 293. Also, Sabal's brief mention of the examination's result concerned the circumstances in which the convicting court revoked Appellant's community supervision for an extraneous offense. Sabal's reference did not concern a polygraph in which Appellant or a witness submitted to questioning about the capital murder for which Appellant was then on trial. The record also does not support Appellant's assertion that Sabal's reference to the polygraph and its result was the product of bad faith.

After review, we find no reasonable probability that Sabal's objected-to testimony interfered with the jury's punishment verdict. The evidence supporting the jury's answers to the punishment-phase special issues was substantial. Sabal's reference to the polygraph's result was brief, unsolicited, and concerned an extraneous matter; further, the

State did not attempt to capitalize upon the reference. *See Coble*, 330 S.W.3d at 293.

Under these circumstances, Appellant has not overcome the presumption that the trial

court's instruction to disregard was sufficient to cure any harm that may have otherwise

resulted from the objectionable testimony. Point of error eleven is overruled.

In point of error twelve, Appellant argues that the trial court erred by allowing two

of Desaree's friends, Allison Nelson and Justus Rodgers, to give victim-impact testimony.

Appellant asserts that their testimony was improper because the State did not elicit their

testimony in response to defense mitigation evidence and because close relatives were

available to provide victim-impact testimony. But Appellant has failed to preserve this

complaint because his argument on appeal does not comport with his objection at trial.

TEX. R. APP. P. 33.1; *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014).

At trial, the sole basis for Appellant's objection was that Nelson and Rodgers were not

family members. The trial court overruled the objection, finding the testimony admissible

under *Mosley v. State,* 983 S.W.2d 249, 263 (Tex. Crim. App. 1998) (concluding that

victim-impact testimony is not rendered improper merely because the witness is not a

family member). Point of error twelve is overruled.

In point of error thirteen, Appellant contends that the trial court erred when it

declined to include the following jury instructions in the punishment charge:

> No juror has to agree with [any] other juror as to what is [a] mitigating
> circumstance or set of circumstances that justifies a sentence of life. The
> duty to deliberate only requires that each juror give careful consideration to
> the evidence in the issue that you are to consider to give an individual true

verdict according to the law and the evidence.

> No juror is to be swayed by mere sentiment, conjecture or sympathy for the deceased or family of the deceased, nor are you to consider any prejudice or public opinions or public feeling that may exist against [Appellant] in considering an answer to Special Issue No. 2.

> During your careful consideration of the special issues, each juror is entitled to his or her own personal moral judgment as to the right answer for these issues.

Appellant asserts that the proposed instructions were all part of the law of capital jurisprudence and were necessary to guide the jury so that it would apply the death penalty in a constitutional manner.

Appellant's argument lacks merit. Article 37.071, subsection (e), sets forth the law applicable to the mitigation special issue. The trial court's charge tracked that statutory language. *See Martinez*, 924 S.W.2d at 699 ("Following the law as it is set out by the Texas Legislature will not be deemed error on the part of the trial judge."). Point of error thirteen is overruled.

In point of error fourteen, Appellant asserts that the trial court reversibly erred by overruling his objection to the State's allegedly improper punishment-phase argument. Appellant contends that the State misstated the law by suggesting that the death penalty would be a proper verdict based only on an affirmative answer to the future-dangerousness special question. He argues that Texas law "presumes that a life sentence is appropriate and a death sentence [inappropriate]" unless the jury answers the future-dangerousness special issue in the affirmative and the mitigation special issue in the

negative.

The record shows that, after correctly stating the two special issues, the prosecutor

linked the evidence presented at trial to them. *See* Art. 37.071, § 2(b)(1), 2(e)(1). The

prosecutor first focused on the offense facts, arguing that the "horrific[,] senseless,

unjustified violence" Appellant had inflicted was relevant to both special issues and

showed that Appellant was the type of person who "deserv[ed] a death

sentence"—"exactly what Special Issue 1 and 2 are about." She also drew the jury's

attention to the evidence of Appellant's extraneous offenses and other bad acts, arguing

that they constituted additional reasons for the jury to return an affirmative answer to the

future-dangerousness special issue. After asking the jury to return an affirmative answer

on future dangerousness, the prosecutor segued into her argument concerning the

mitigation issue:

> The answer to Special Issue No. 1 is yes. What the State of Texas asks [is] that you vote that way, all of you, and you move on to Special Issue No. 2.
>
> Now on this special issue, we don't have the burden of proof, [and] neither does the defense. It's left up to you. And [Special Issue No. 2] really asks you is there anything that is sufficiently mitigating to warrant that he shouldn't have the death sentence that you've already determined that he deserves by the answer of yes to Special Issue No. 1.

Appellant objected to the last sentence of the passage set forth above, arguing that it

misstated the law because "the death sentence is not imposed until all questions are

answered." The trial court overruled the objection.

We perceive no misstatement of law. The prosecutor did not argue that Appellant could lawfully receive a death sentence based only on an affirmative answer to the future-dangerousness special issue. The State's argument was reasonably understood as a hypothetical, in which it posited that the jury had already answered "yes" to the future-dangerousness special issue and was beginning to deliberate on the mitigation issue. Once the jury has made an affirmative finding concerning future dangerousness, a defendant's sentence is presumptively death unless, after considering the mitigating evidence presented to it, the jury also answers the mitigation special issue in the affirmative or deadlocks on that issue. *See* Art. 37.071, § 2(g). Point of error fourteen is overruled.

## VI. VOIR DIRE—*BATSON* CHALLENGES

In points of error fifteen and sixteen, Appellant alleges that the trial court erred in denying his *Batson*[12] challenges to the State's use of peremptory strikes against African-American veniremembers Viola Brimmer and Leamon Parker. Appellant, who is African-American, contends that racial discrimination motivated the strikes.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from exercising peremptory strikes based solely on the basis of a potential juror's race. *Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012). A *Batson* challenge involves a three-step process. *Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013). First, the defendant must make a prima facie showing of racial

---

[12]*Batson v. Kentucky*, 476 U.S. 79 (1986).

discrimination. *Nieto*, 365 S.W.3d at 676. In the second step, the burden of production shifts to the prosecutor, who must articulate a race-neutral explanation for the strike. *Id.* Finally, the trial court determines whether the defendant has proved purposeful discrimination. *Id.*

The trial court's ruling on the purposeful-discrimination step must be upheld unless it is clearly erroneous. *Id.* In determining whether clear error occurred, we are not limited to the arguments or considerations that the parties specifically called to the trial court's attention; rather, we look to the entire record of voir dire. *Blackman*, 414 S.W.3d at 765. We review the evidence in the light most favorable to the trial court's ruling. *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).

The record shows that Brimmer's individual voir dire took place before Judge Quay Parker.[13] Lead prosecutor Heath Harris questioned Brimmer for the State. At the conclusion of Brimmer's voir dire, the State exercised the first of its fifteen statutorily granted peremptory strikes to remove her from jury service. *See* Art. 35.15(a). Defense counsel responded with a preemptive *Batson* challenge, noting Brimmer's race and gender, and that the State had used its first peremptory strike against a person of a minority race. Harris and two other members of the prosecution team who were present during Brimmer's voir dire—Jason Hermus and Rachel Jones—made a contemporaneous record of their race-neutral reasons for striking Brimmer.

---

[13]Judge Mark Stoltz presided over Appellant's trial. In addition to Judge Parker, Judges Joseph Clayton, Webb Biard, and Jim Fry assisted Judge Stoltz with individual voir dire.

Harris stated that he was concerned that Brimmer would demand that the State meet

a higher standard of proof than the law required. Harris asserted that Brimmer's juror-

questionnaire responses and individual voir dire testimony manifested Brimmer's belief

that the death penalty had been applied disproportionately to African-Americans in Texas,

generally, and in Dallas County, specifically. Harris also noted that, in her questionnaire

responses, Brimmer had expressed a clear preference for life without the possibility of

parole over a death sentence. Harris said that Brimmer's sentencing preference also

manifested itself during her voir dire through Brimmer's reluctance to say that she could

answer the special issues according to the evidence, if doing so would result in a death

sentence:

> And when I asked her on numerous occasions, numerous time after time
> [sic] trying to get her to commit that if we prove [Appellant guilty of capital
> murder] and if Special Issue One was answered yes and Special Issue Two
> was answered no, if she could render a death sentence, she was very, very
> reluctant in answering. I almost at one point had to move on because I
> couldn't get her to say that she would do death over life.

> And I just think that it's clear from [Brimmer's voir dire] that there seemed
> to be a huge reluctance on her part to ever really consider a death sentence
> versus a life sentence without the possibility of parole, which is what she
> indicated not only on her questionnaire but also here today. And that's the
> primary reason I struck her.

Hermus stated that he and Jones concurred with Harris on all the reasons Harris had

expressed to the court. Hermus then gave his additional reasons for striking Brimmer.

Hermus stated that he had concerns with Brimmer before her individual voir dire, based on

the equivocating nature of many of her juror-questionnaire answers, and he offered a

nonexhaustive list of examples: (1) Brimmer was not sure whether she favored the death penalty, (2) Brimmer wrote "none at this time" when asked to provide the best argument for the death penalty, and (3) Brimmer thought conviction of multiple murders was "possibly" a proper basis for death eligibility. Hermus asserted that Brimmer's live testimony often reflected a similar equivocation. He noted that Brimmer often rephrased Harris's questions into what she apparently wanted the question to be, rather than what Harris had asked.

Hermus stated that Brimmer's demeanor during the State's voir dire also troubled him. He observed Brimmer make faces at Harris or grimace on four different occasions when Harris tried to elicit her opinion on the death penalty and ability to impose it. Hermus believed that Brimmer's facial expressions and accompanying verbal responses indicated either displeasure with or disdain toward Harris. Alternatively, Hermus believed that Brimmer's expressions and responses reflected her reluctance to answer the special issues according to the evidence if a death sentence would result. Hermus also noted that Brimmer said that she had an issue with African-Americans being "railroaded" onto Death Row. Lastly, Hermus mentioned that Brimmer's "reluctance initially to [sic] circumstantial evidence" concerned the prosecution team.

Jones added that she was also troubled by Brimmer's hesitation and facial expression when Harris asked whether Brimmer could convict someone on the testimony of one witness, if the witness could testify to every element of the offense and Brimmer

believed the witness. Jones asserted that Brimmer's facial expression and response indicated disbelief that the State could obtain a conviction for capital murder based on the testimony of only one witness. Jones acknowledged that Brimmer qualified her initial response, but Jones asserted that Brimmer's qualification was also problematic because it suggested that Brimmer would require eyewitness testimony:

> [W]hen we talked to her about proving our case with one witness and if she believed that witness, she proceeded to go on -- she had some hesitation about that and, again, her facial expression, saying, how could you only have one witness?
>
> And then she qualified it by saying, oh, well, if that one witness saw him commit the crime, and managed to get out, before they too were stabbed, well, then okay, then I could do it.

Jones also cited Brimmer's responses when Harris discussed the State's burden of proof and tried to determine whether Brimmer would increase that burden. Jones asserted that Brimmer's answers were equivocal or uninformative, because Brimmer would essentially say no more than, "I just expect you to prove it. I would expect you to prove it." Jones also stated that towards the end of the State's voir dire, Brimmer expressed the sentiment that, in her heart, she did not believe in the death penalty.

After the prosecutors gave their reasons for striking Brimmer, defense counsel stated that he would reserve questions because the *Batson* challenge was premature at that stage of voir dire. Judge Parker agreed that the challenge was premature and denied it, stating that Appellant could reurge it at a later time.

A week later, venire member Parker's individual voir dire took place before Judge

Clayton. Harris questioned Parker for the State. At the conclusion of defense counsel's

voir dire, prosecutor Jones challenged Parker for cause on two grounds. *See* Art. 35.16.

First, Jones asserted that, although his answers on the issue vacillated somewhat, Parker's

final answer during the State's voir dire was that the prosecution would have to prove its

case to a degree that left no doubt in his mind. Jones argued that Parker was, therefore,

requiring 100% proof from the State—more than proof beyond a reasonable doubt—which

made him challengeable for cause under *Narvaiz v. State*, 840 S.W.2d 415, 427 (Tex.

Crim. App. 1992). Second, Jones argued that Parker did not consider circumstantial

evidence to be valid and could not return a guilty verdict based solely on circumstantial

evidence. When these challenges for cause were unsuccessful, Hermus lodged two

additional challenges for cause based on Parker's opposition to the death penalty as

expressed in his juror questionnaire responses and voir dire testimony. Judge Clayton also

denied the State's additional challenges for cause.

The next day, the State used its second peremptory strike to remove Parker from the

venire. Hermus asked to place the State's reasons for the strike on the record, in case of a

later *Batson* challenge. Hermus stated that the State struck Parker based on his

questionnaire answers and voir dire testimony. Hermus particularly drew the court's

attention to Parker's answers to the following questions:

- (Q. 1) Parker indicated that he was not in favor of the death penalty and wrote, "Only God should make that decision."

- (Q. 2) Parker indicated that he did not believe that the death penalty

should ever be imposed, but if the law provided for it, he could assess it under the proper circumstances.

- (Q. 4–5) Parker asserted that he had moral, religious, or personal beliefs that would prevent him from sitting in judgment of another human being or returning a verdict that would result in another's execution. In explanation, Parker wrote that "[t]he Bible tells us not to judge others" and returning a verdict that would result in a death sentence "mean[t] I [was] judging another and could cost them their life."

- (Q. 7) Parker wrote "none" when asked to provide the best argument for the death penalty.

- (Q. 8) Parker wrote that "God[']s word" was the best argument against the death penalty.

- (Q. 10) Parker disagreed with Texas law to the extent it makes multiple-murder a capital offense.

- (Q. 11) Parker disagreed that some crimes warrant the death penalty solely because of their severe facts and circumstances, regardless of whether the guilty person has committed prior violent acts. Parker wrote, "If you kill the[n] you are no better than they are."

- (Q. 12) Parker disagreed with Texas law to the extent it permits conviction of a crime, including capital murder, based solely on circumstantial evidence, with no eyewitnesses. Parker wrote, "That is not beyond a reasonable doubt to me."

- (Q. 14) Parker indicated that he did not believe in an eye for an eye, writing that "God said turn the other cheek."

- (Q. 18) Parker indicated that he did not believe that Texas applies the death penalty fairly. Parker wrote, "By statistic[s,] black men are given the death penalty more than whites, therefore I feel it is unfair."

- (Q. 20) When asked whether he believed the death penalty is used too often or too seldom, Parker wrote, "Too often, one is too many."

- (Q. 130) Parker indicated that he would not want to serve as a juror in Appellant's case, writing, "Because of the death penalty."

Hermus stated that Parker's responses to the foregoing questionnaire items reflected a strong bias against the death penalty, and Hermus did not believe that Parker could set it aside.

Based on Parker's questionnaire responses and voir dire testimony, Jones echoed Hermus's belief that, despite Parker's best efforts, he would not be able to overcome his scruples against the death penalty. Jones added that they were also concerned by the hesitation and reservations that Parker expressed about circumstantial evidence, as well as the burden of proof he would impose on the State,

> And then we asked him, [e]ven if you believe the circumstantial evidence, could you find somebody guilty, he vacillated on that. He said, [t]o me, circumstantial evidence is no proof that there's a case, and that he would always be concerned that it was somebody else that did it without an eyewitness. . . . [T]here could have been . . . other people involved that would lead to this person being innocent, and that he would want us to prove the case to him to where he would have no doubt in his mind, which is why the State submitted him for a challenge for cause on requiring 100 percent proof. He further said that circumstantial evidence, he considers that weak evidence.

Judge Clayton overruled Appellant's *Batson* challenge as to Parker, with leave to reurge the challenge later in voir dire.

When the *Batson* hearing occurred, about halfway through voir dire, the State had used a total of four strikes, exercising its third and fourth peremptory challenges to remove two white veniremembers, including Linda Schultz. Judge Stoltz presided over the *Batson*

hearing, assisted by Judge Clayton, who had conducted Parker's individual voir dire. Attempting to show that the State's race-neutral explanations for striking Brimmer and Parker were pretextual, defense counsel asserted that Brimmer, Parker, and a white venire member, John Nily, had each indicated on their questionnaires that they "had problems" with circumstantial evidence. Defense counsel asserted that the State had questioned Nily differently about the subject by giving him a more full explanation of what such evidence includes. Defense counsel examined prosecutors Harris (who had questioned Brimmer and Parker) and Jones (who had questioned Nily), asking them to explain the alleged disparity.

Harris testified that the general explanation of circumstantial evidence he gave to veniremembers varied, depending on different factors. Harris stated that the key difference between Brimmer, Parker, and Nily was that, although all three indicated on their questionnaires that they had problems with circumstantial evidence, Nily specifically indicated that he favored the death penalty. In contrast, Parker voiced strong opposition to the death penalty and Brimmer indicated uncertainty about the death penalty and a preference for life without the possibility of parole. Harris testified that the State's main concern with Parker was his very strong opposition to the death penalty. Harris said that Parker's attitudes toward circumstantial evidence also concerned the State but were secondary to Parker's stance on capital punishment. Harris testified that he tailored his questioning of Parker accordingly. Harris also testified that he explained to Parker that circumstantial evidence includes DNA and fingerprint evidence.

Harris testified that Brimmer's opposition to the death penalty was not as apparent from her questionnaire responses as Parker's, but it became clear during voir dire that she strongly favored life imprisonment without the possibility of parole over a death sentence. As to defense counsel's allegation that he did not explain the concept of circumstantial evidence to Brimmer, Harris noted that Brimmer was a trained paralegal and mediator who had worked for several law firms. Harris testified that Brimmer was not an average juror and gave no sign of needing the concept explained to her. Moreover, when Harris explained other aspects of death-penalty law, Brimmer's demeanor suggested that she felt insulted.

Harris testified that Brimmer's legal background and current employment also factored into the State's decision to strike her. Harris stated that the prosecution team subjected individuals with legal backgrounds to greater scrutiny due to concern that they would be more opinionated and likely to influence other jurors during deliberations. Harris asserted that Brimmer's job as an administrative officer for a Veteran's Hospital was problematic, because it potentially brought her into contact with people having mental-health complaints. Harris testified that similar concerns had caused the State to use its fourth peremptory strike against venire member Schultz, who was white and headed the special-education department for a local high school.

Defense counsel questioned Jones about her description, during Nily's voir dire, of circumstantial evidence as "almost a trick question." Jones denied that, by using the term

"trick question," she had meant that either party had designed questions to trick potential jurors. Jones explained that she used that phrase merely to reassure Nily. Jones stated that Nily had seemed a little intimidated by the process, based on his demeanor on the stand and statements that he had never been to court or involved in jury selection. When she asked him about circumstantial evidence, Jones explained:

> [Nily] seemed maybe ashamed . . . when I said, do you know that circumstantial evidence includes things like DNA and fingerprints? [T]he record can't fully reflect it, but he did one of these like no, just kind of backing away, looking around at everybody.

> And, so, I wanted to reassure him that there was nothing wrong with it, that it is somewhat of a trick question, and I think -- We don't explain that DNA and fingerprints are circumstantial evidence. Most people don't think about it in those terms, and that was exactly how it was with him.

Defense counsel asked Jones why the State did not provide the same explanation to Brimmer and Parker. Jones responded that Harris had given Parker substantially the same explanation and that Brimmer did not seem to need an explanation. Jones further testified that the State's main concern during voir dire was always the venire member's attitudes about capital punishment. Jones asserted that Brimmer and Parker held fundamentally different views from Nily. Jones explained that Brimmer said that she would keep the death penalty if she were governor of Texas, but also stated that, in her heart of hearts, she believed in life imprisonment without the possibility of parole rather than death. Jones stated that Parker did not believe in the death penalty, but asserted that he was willing to perform his civic duty, even at the risk of violating his conscience. Jones asserted that

Nily, in contrast, testified that he had always believed in the death penalty and would expand death eligibility to rapists and repeat child abusers.

At the conclusion of the hearing, Judge Stoltz stated that he had reviewed the transcripts of Brimmer's, Parker's, and Nily's individual voir dire. He denied Appellant's *Batson* challenges to Brimmer and Parker, finding that the State's facially race-neutral reasons for striking them Brimmer and Parker were genuine and reasonable.

After twelve jurors had been seated, the defense reurged its *Batson* challenges to Judge Stoltz. Defense counsel asserted that, before the *Batson* hearing, the prosecution team had questioned African-American veniremembers differently than they had questioned other potential jurors. Counsel argued that, following the *Batson* hearing, the prosecutors began to question African-American veniremembers in a way that was more consistent with how they questioned other jurors. Counsel averred that the alleged change supported the defense's argument that race motivated the State's strikes against Brimmer and Parker. Defense counsel noted that, following the *Batson* hearing, the parties had accepted James Brown, an African-American male, as a juror. Counsel offered the transcript of Brown's individual voir dire as an exhibit to support his reurged *Batson* challenges.

Jones, who had questioned Brown for the State, responded that the State's questioning during individual voir dire was

> a fluid proposition . . . based on the questionnaire. It depends on how the
> juror answers the questions, it depends on the style of the prosecutor who is

> doing that individual questioning. So yes, some of the questions may change, some may be more in-depth depending on what answer the juror gives, and certainly, as we pointed out before, it all starts with how and whether or not that person believes in the death penalty.
>
> Mr. Brown has always believed in the death penalty, he talked about that in his questionnaire, talked about that in individual voir dire.
>
> Mr. Parker on his questionnaire said he did not believe in the death penalty and never has, thereby marking a three [on Question 2]. [Brimmer] marked a two on [Question 2 of] her questionnaire. However, one of the first things she said in voir dire [was] that she did not favor the death penalty or believe in it.

Jones asserted "absolutely" that any change in the State's questioning was due to the way the veniremembers answered the questionnaire, rather than the color of their skin. Jones also noted that, besides accepting Brown as a juror, the State also accepted Betty Pettway, Rosetta Johnlouis, and Diane Tyler, all of whom were African-American. Jones stated that Pettway was seated as juror, while the defense used peremptory challenges against Johnlouis and Tyler. After reviewing Brown's questionnaire and the transcript of his individual voir dire, Judge Stoltz again denied Appellant's *Batson* challenges.

After reviewing the entire record of voir dire, we conclude that Appellant is not entitled to relief. Initially, we note that the State exercised only seven of its fifteen available peremptory strikes, using only two of those seven against African-American jurors. It used the other five against white veniremembers. The State also accepted four African-American veniremembers as jurors, and ultimately two of those individuals served on Appellant's jury. Further, the record amply supports the race-neutral explanations that

the prosecution team offered at the time of the strikes, the *Batson* hearing, and when Appellant reurged his *Batson* challenges after twelve jurors had been seated. *See Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001) (stating that valid and neutral reasons for exercising a peremptory challenge include a veniremember's vacillation regarding his capacity to impose the death penalty despite personal beliefs, and numerous answers in a veniremember's questionnaire indicating a bias against the imposition of the death penalty).

After viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court's denial of Appellant's *Batson* challenges was not clearly erroneous. *Young*, 283 S.W.3d at 866. Points of error fifteen and sixteen are overruled.

### VII. VOIR DIRE—DENIALS OF CHALLENGES FOR CAUSE

In points of error eighteen through thirty-four, Appellant alleges that the trial court erred in denying his challenges for cause to seventeen veniremembers: Jimmy Lumpkins, Bevin Koshy, Chad Newton, Andrew Askins, Veronica Hernandez, Jana Morgan, Pieter Kessels,[14] Jennifer Hilburn, Charles Sturgeon, Rosetta Johnlouis, Diana Tyler,[15] Tiffany Langdon, Camille Sowden, Karen Evans, Patti Matthews, Gaylord O'Con, and Kenneth Adair. The record shows that Appellant exhausted his fifteen peremptory strikes, using

---

[14]In point of error twenty-four, Appellant names "Peter Kessels" as the venire member at issue. In the record, Kessels's first name appears as "Pieter."

[15]In point of error twenty-eight, Appellant names "Diane Taylor" as the juror against whom he raised a challenge for cause. We understand him to refer to venire member Diana Tyler.

fourteen of them to remove Lumpkins, Koshy, Newton, Askins, Hernandez, Morgan, Kessels, Hilburn, Sturgeon, Johnlouis, Tyler, Langdon, Sowden, and Evans after the trial court denied his cause-based challenges to them.[16] After Evans's dismissal, Appellant received and used two additional peremptory strikes to remove Matthews and O'Con after unsuccessfully challenging them for cause. The trial court denied Appellant's challenge for cause to Adair, as well as Appellant's request for a third additional strike. Appellant asserted that, as a result of the trial court's refusal to grant an eighteenth peremptory strike, he had been forced to accept an objectionable juror, Adair.[17] Because Appellant received two additional peremptory strikes, he can only demonstrate harm by showing that the trial court erroneously denied at least three of his challenges for cause. *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014); *Chambers v. State*, 866 S.W.2d 9, 22–23 (Tex. Crim. App. 1993).

A defendant may challenge a venire member for cause if the member is biased or prejudiced against the defendant or the law on which the State or defendant is entitled to rely. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *see* Art. 35.16(a)(9), (c)(2). A trial court must excuse the prospective juror if bias or prejudice would substantially impair the juror's ability to carry out his oath and instructions in accordance with the law. *Feldman*, 71 S.W.3d at 744. But before the judge excuses a potential juror

---

[16]Appellant exercised his eighth peremptory strike against venire member Can Icduygu. Appellant did not challenge Icduygu for cause.

[17]The record shows that Adair became the twelfth member of Appellant's petit jury.

for cause, the law must be explained to the juror. *Gardner*, 306 S.W.3d at 295. The proponent of the challenge for cause bears the burden of establishing that the challenge is proper. *Id.* The proponent does not meet this burden until he has shown that the venire member understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Id.*

When reviewing a trial court's decision to deny a challenge for cause, we look to the entire record to determine whether sufficient evidence exists to support the court's ruling and reverse only for a clear abuse of discretion. *Davis*, 329 S.W.3d at 807. Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295; *see Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994) (stating that the trial judge is in the best position to determine whether a potential juror will set aside his views and honestly and truthfully follow the juror's oath). When a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision. *Gardner*, 306 S.W.3d at 295; *Moore v. State*, 999 S.W.2d 385, 400, 407 (Tex. Crim. App. 1999).

*A. Lumpkins*

When defense counsel asked Lumpkins to explain his feelings about the insanity defense, he answered: "I think -- I think it would have to be very strong, compelling

evidence, but it's not something I reject out of hand." Defense counsel argued that this statement showed that Lumpkins would require Appellant to prove insanity by a compelling-evidence standard, rather than a preponderance. *See* TEX. PENAL CODE § 8.01(a).

The trial court did not abuse its discretion in denying Appellant's challenge for cause on this basis. Lumpkins's statement did not necessarily indicate that he would require Appellant to prove insanity by more than a preponderance standard. Further, the remainder of the exchange between Lumpkins and defense counsel suggested that Lumpkins did not see "compelling" evidence as something that was inconsistent with a preponderance-of-the-evidence standard. After Lumpkins used the phrase "compelling evidence" and stated that he would not automatically reject an insanity defense, defense counsel continued to question him as follows:

> [DEFENSE]: Yes. We just can't -- We can't be flippant about it. As you've indicated in your answers before, I assume you mean that, you know, you want something of substance.

> [LUMPKINS]: Yeah, it can't be because that's the only recourse.

> [DEFENSE]: Right. Okay. And I think society, especially as recognized in this state and other states, as a society, we don't want to punish people who do not know, because of some mental disease or defect, that they don't know the difference between right and wrong. Is that a fair statement?

> [LUMPKINS]: Uh-huh.

> [DEFENSE]: Okay. And in that same vein, can you see that there are some circumstances in which people actually physically go through acts that cause people to die, or cause things to happen that are criminal offenses,

and that they don't know what they are doing because of some mental
disease or defect?

[LUMPKINS]: I agree it's possible.

[DEFENSE]: It's possible. Okay. And that we have to sometimes look at all
the circumstances surrounding an event and possibly rely on other people
who study, make a profession of studying the mind; is that a fair statement?

[LUMPKINS]: It's why I said it's compelling.

In addition, during earlier questioning by the State, Lumpkins evinced his

understanding of Appellant's burden of proof regarding the insanity defense and

unequivocally stated that he would apply it if selected to serve. After informing Lumpkins

that Appellant might assert an insanity defense, the prosecutor discussed the concept of

legal insanity and explained Appellant's preponderance burden of proof. The prosecutor

then probed Lumpkins's ability to follow the law, if Appellant raised an insanity defense:

[PROSECUTION]: [I]f [insanity] were the defense, could you really use
your best judgment in determining whether or not the insanity is bona fide
or bunk?

[LUMPKINS]: Well, that would depend on the preponderance of the
evidence to support it.

[PROSECUTION]: Sure.

[LUMPKINS]: In that event, yes.

After discussing other topics related to the insanity determination, the prosecutor returned

to Appellant's preponderance burden of proof:

[PROSECUTION]: If you find the defendant not guilty, he goes home.
Okay? And when I talked to you earlier about insanity, the way insanity

works is that, if you do believe [by] a preponderance of the evidence [that]
the defendant did not know that what he was doing was wrong at the time
of the commission of the offense, you have to find him not guilty by reason
of insanity. That's what your oath is going to require you to do. If you
believe that, will you do it?

[LUMPKINS]: Yes.

Lumpkins's entire voir dire contains sufficient evidence to support the trial court's

ruling. *Davis*, 329 S.W.3d at 807. Thus, Appellant has not demonstrated that the trial court

erred in overruling his challenge for cause to Lumpkins. Point of error eighteen is

overruled.

### B. Askins

Defense counsel argued that Askins would require a higher burden of proof than the

law required on the issue of insanity. The record of his individual voir dire shows that

Askins vacillated about his ability to apply the preponderance standard, should Appellant

have raised an insanity defense.

When questioned by the State, Askins asserted that he could find Appellant not

guilty by reason of insanity if Appellant raised that defense at trial and proved it by a

preponderance of the evidence. When defense counsel asked Askins whether he had any

problems with the idea of an insanity defense, the venire member retreated from his

original position:

[ASKINS]: You know, it's hard for me to consider. I mean obviously there
are always circumstances that can bring that into play. But, honestly, it is
hard for me to consider the insanity defense, so I mean.

[DEFENSE]: Would you, since our burden of proof is not to the level of beyond a reasonable doubt on insanity, it's by a preponderance which is just kind of like more likely than not, like a -- If you're using percentages, it would be like 50.001 percent that we have to get to. Would you require the defense to have a higher burden of proof in the insanity issue because it would be so hard for you to consider?

[ASKINS]: Yeah.

[DEFENSE]: You would?

[ASKINS]: Yeah, I would.

Defense counsel then requested a recess and challenged Askins for cause. The trial court denied the challenge and after recalling Askins to the stand, addressed him directly:

[COURT]: Mr. Askins, the burden on the defense on the issue of insanity, it's their burden, it's by a preponderance of the evidence. The legal definition of preponderance of the evidence is the greater weight of the credible and believable evidence. That's their burden.

[ASKINS]: Okay.

[COURT]: Can you accept that burden?

[ASKINS]: Yes.

[COURT]: Okay. Would you apply that burden --

[ASKINS]: Yes.

[COURT]: -- in answering the issue on insanity?

[ASKINS]: Yes.

After the trial court asked Askins to step outside, defense counsel renewed the challenge. The trial court again denied it.

The trial court did not abuse its discretion. To the extent Askins vacillated about his ability to apply a preponderance standard to Appellant's insanity defense, the trial judge was in the best position to determine whether the venire member would set aside his views and honestly and truthfully follow the juror's oath. *Burks*, 876 S.W.2d at 893. In his final statement on the issue, Askins asserted that he could, and would, follow the law. The trial judge was entitled to believe him, and we defer to that belief. *See Gonzales v. State*, 353 S.W.3d 826, 836 n.7 (Tex. Crim. App. 2011). Point of error twenty-one is overruled.

## C. Hernandez

Defense counsel argued that Hernandez could not follow the law regarding the insanity defense and would elevate the defense's burden of proof. The record shows that, under questioning by the State, Hernandez unequivocally stated that she could and would apply the preponderance standard if Appellant raised an insanity defense and would acquit him if he satisfied that standard. When questioned by defense counsel, Hernandez again agreed that Appellant's burden of proof regarding the insanity issue was a preponderance standard. However, in response to a follow-up question, Hernandez manifested some confusion about the possible evidentiary burdens and the differences between them:

> [DEFENSE]: Well, let me ask it to you this way. Is [preponderance] going to be the same burden as like clear and convincing evidence or by proof beyond a reasonable doubt to you?
>
> [HERNANDEZ]: Beyond a reasonable doubt.
>
> [DEFENSE]: Well, you shook your head and you said proof beyond a reasonable doubt, so I didn't understand what that meant to you.

[HERNANDEZ]: It's beyond a reasonable doubt.

[DEFENSE]: Okay. So you're saying that a preponderance of the evidence is going to have to be proven to you beyond a reasonable doubt?

[HERNANDEZ]: Yes.

Defense counsel clarified that preponderance of the evidence was an evidentiary standard of its own and explained where it stood in relation to the clear-and-convincing and reasonable-doubt evidentiary burdens. After stating that the law required Appellant to prove insanity by a preponderance of the evidence, counsel returned to his original question:

> [DEFENSE]: [O]kay, would you be able to hold us to that burden, or do you think it's going to take more like clear and convincing evidence or proof beyond a reasonable doubt?
>
> [HERNANDEZ]: I could hold you to that burden.
>
> [DEFENSE]: You could -- I'm sorry?
>
> [HERNANDEZ]: I could do that by a preponderance.

Defense counsel then asked Hernandez for her thoughts on psychiatrists and psychologists. When Hernandez responded, "There needs to be more like evidence from different doctors," this exchange followed:

> [DEFENSE]: Okay. So if we were to bring you one doctor and you believed him, by a preponderance of the evidence, that our client was insane at the time of the offense, is that going to be sufficient for you, or are you going to need more than that?
>
> [HERNANDEZ]: I think I'll need more than that.

[DEFENSE]: So you're going to -- And this is where we have to use the terms biased and prejudiced.

[HERNANDEZ]: That's fine.

[DEFENSE]: To some degree, you're going to have a bias against the defense because you're going to require, even if you believe that one doctor by a preponderance of the evidence, you're going to require more than that; is that correct?

[HERNANDEZ]: Yes, just to be on the safe side.

[DEFENSE]: And that was a yes; is that correct?

[HERNANDEZ]: Yes, sir.

[DEFENSE]: Okay. And as I've explained to you, you know, I've told you in that situation you believe that expert, okay, and you believe him and you believe that we've proven our case by a preponderance of the evidence.

But what you're telling me is, even though you believe that, and you believe it by a preponderance of the evidence, you're going to require more, correct?

[HERNANDEZ]: He needs to gain my -- I need to be able to, you know, I need to be able to trust him. You know, I need to see like what kind of history that doctor has and all that.

[DEFENSE]: Okay. Well, I'm telling you, okay, I'm telling you right now that you believe him. Okay? And you believe him --

[HERNANDEZ]: So you're telling me that I believe him.

[DEFENSE]: Yeah, and I'm saying --

[HERNANDEZ]: would say I believe him.

Evidently uncertain whether Hernandez understood the hypothetical or dissatisfied with her answer, defense counsel re-emphasized the assumptions he was asking Hernandez

to make, then continued,

> [DEFENSE]: And you've indicated to me that, in that situation, you're going to require more than one doctor. Is that still --
>
> [HERNANDEZ]: Yes. If it's possible, yes. But I mean if he already gained my trust and has more -- the balance is more on this side, like it's better.
>
> [DEFENSE]: Let me just -- The trust and everything, that's something that's personal to you. Okay.
>
> [HERNANDEZ]: Okay.
>
> [DEFENSE]: All I can tell you is what the law says. And I'm now trying to put you in a situation where, under the law, we've proven to you by a preponderance of the evidence --
>
> [HERNANDEZ]: Yes.
>
> [DEFENSE]: -- that he has proven that he was insane by the preponderance of the evidence. Just that burden, okay?
>
> [HERNANDEZ]: Okay.
>
> [DEFENSE]: And what you have indicated to me is that, given that situation, you would have a bias against --
>
> [HERNANDEZ]: Well, if it's by law, then I need to follow the law.

After observing that it was everyone's natural tendency to say that she could follow the law, counsel posed the hypothetical to Hernandez again and asked what her verdict would be. Hernandez responded that, "I always go with whatever the law says." Counsel continued to press Hernandez:

> [DEFENSE]: So you understand what I'm getting at here, okay?
>
> [HERNANDEZ]: Uh-huh.

[DEFENSE]: I'm telling you that we've proven to you by the preponderance of the evidence --

[HERNANDEZ]: You've already proven it to me.

[DEFENSE]: And I want to know, what would your verdict be in that situation?

When the prosecutor objected that the question had already been asked and answered, the trial court stated, "He can ask it again. He can ask it for three more minutes. I've heard -- I've heard what she said." When defense counsel asked Hernandez for her answer, she stated, "If it's already been proven, then yes, I'll go with that." Defense counsel concluded his voir dire and immediately afterward challenged her for cause. The trial court denied the challenge.

The trial court did not abuse its discretion. Hernandez repeatedly stated that she would hold Appellant to a preponderance standard regarding his insanity defense. To the extent that Hernandez's answers sometimes suggested she would hold Appellant to a higher burden, the record supports a finding that those responses were based on her temporary misapprehension of the law or confusion over defense counsel's hypotheticals. Further, the trial judge was in the best position to evaluate Hernandez's demeanor and responses. *See Davis*, 329 S.W.3d at 807. We extend particular deference to the trial judge's decision in these circumstances. *See id.* Point of error twenty-two is overruled.

### D. Morgan, Hilburn, Langdon, and O'Con

Defense counsel challenged Morgan, Hilburn, Langdon, and O'Con solely due to

certain written responses they gave on the juror questionnaire, arguing that the answers showed that these veniremembers would automatically vote for the death penalty. The trial court did not abuse its discretion in overruling Appellant's challenges for cause to these four prospective jurors.

While a juror who would automatically vote for the death penalty can be challengeable for cause once a proper basis is established, Appellant failed to establish the proper bases to challenge these veniremembers for cause. To establish those bases, Appellant had to show that "the veniremember[s] understood the requirements of the law and could not overcome [their] prejudice well enough to follow the law." *Gardner*, 306 S.W.3d at 295. The requirements of the law are explained during voir dire[18] and after the questionnaire or juror card is answered.[19] As a result, a veniremember cannot be sufficiently questioned regarding possible prejudice revealed in the questionnaire or during voir dire without, at least, some minimum amount of interaction on the part of the veniremember during voir dire.

---

[18]*See, e.g.*, *Cardenas v. State*, 325 S.W.3d 179, 185–86 (Tex. Crim. App. 2010) (stating that the trial judge, prosecutor, and defense attorney explained the requirements of the law applicable to the case to the venire panel during voir dire); *Barnard v. State*, 730 S.W.2d 703, 715 (Tex. Crim. App. 1987) (holding that the trial judge did not err by conducting a general voir dire before individual voir dire in a capital case because the defendant was allowed to individually voir dire veniremembers regarding the law of capital murder); *Martinez v. State*, 867 S.W.2d 30, 35 (Tex. Crim. App. 1993) (same).

[19]*See, e.g.*, *Garza v. State*, 7 S.W.3d 164, 166 (Tex. Crim. App. 1999) (noting that written questionnaires are not a formal part of voir dire proceedings and, in some cases, questionnaires or juror information cards can be submitted "long in advance of voir dire").

Therefore, because Appellant solely relied on their questionnaire answers in challenging Morgan, Hilburn, Langdon, and O'Con for cause, he could not have established proper bases for challenging these veniremembers, and it was within the trial court's discretion to determine that Appellant did not satisfy his burden to show that the challenges were proper. *See Garza*, 7 S.W.3d 164, 166 (Tex. Crim. App. 1999). Points of error twenty-three, twenty-five, twenty-nine, and thirty-three are overruled.

### E. Kessels

Defense counsel argued that Kessels would automatically impose the death penalty if Appellant were convicted of capital murder. At trial, counsel alluded to a portion of Kessels's voir dire testimony, in which counsel paraphrased Kessels as "say[ing] something about that he would start out at a death penalty and that it would take a lot of thinking for him to get back to neutral." The trial court denied Appellant's challenge.

In support of his argument, Appellant directs us to a portion of Kessels's voir dire by the State. The prosecutor had begun to discuss the future-dangerousness special issue. He had explained that it was permissible for a juror to answer the future dangerousness issue "yes" based on the circumstances of the offense, if the juror believed that the circumstances so warranted. However, the prosecutor had also emphasized that the juror's answer to the future dangerousness issue could not be automatic. Although Kessels answered "yes" when the prosecutor asked whether he could follow the process, the prosecutor noted hesitation in Kessels's response. Noting the unfamiliarity of the special

issues to most jurors, the prosecutor asked Kessels to explain. Kessels responded:

> [KESSELS]: When you said that I have to not really be able to answer question -- Special Issue 1 until you've had the burden of proving it.
>
> [PROSECUTOR]: Okay.
>
> [KESSELS]: I really just have a general belief that if someone commits, what you're saying, a multiple murder, a multiple stabbing murder, that there inherently may be something in them that's going to make me answer that yes.
>
> [PROSECUTOR]: Okay.
>
> [KESSELS]: So that might be something that I would have to work on to get a more neutral playing field before that started.

Appellant based his challenge on these statements.

The trial court did not abuse its discretion in denying Appellant's challenge for cause to Kessels. The record shows that Kessels made the complained-of statements before the law was fully explained to him. Following Kessels's statements, the prosecutor again noted jurors' general unfamiliarity with capital-sentencing procedures and explained the second special issue. The prosecutor then presented a hypothetical to help Kessels understand the special issues' interaction and why jurors should not automatically answer them a certain way, even when a capital-murder conviction involved multiple murders. The prosecutor began by describing the bare facts of a hypothetical capital murder involving two victims—facts from which, without additional information, a jury might reasonably draw negative inferences concerning the special issues (i.e., that the death penalty should be assessed).

But the prosecutor then gave Kessels various examples of evidence that might be presented only at the punishment phase and that might lead jurors to answer the special issues in a way that would result in a life sentence without the possibility of parole. Afterward, the prosecutor questioned Kessels as follows:

> [PROSECUTOR]: And can you see how not having heard all the evidence [yet], the answer has to start out no on Special Issue 1 until we prove it otherwise and until you've kept an open mind and heard all the evidence?
>
> Does that make sense?
>
> [KESSELS]: It does.
>
> [PROSECUTOR]: Okay. Does that clear up your hesitation?
>
> [KESSELS]: Yes. Great explanation.

Kessels subsequently asserted that the procedure and rationale surrounding the special issues made sense to him, and that he had no hesitation about being able to participate in the process and keep an open mind until he heard all the evidence.

The record contains sufficient evidence to support the trial court's ruling. *Davis*, 329 S.W.3d at 807. Point of error twenty-four is overruled.

### *F. Sturgeon*

Appellant asserts that Sturgeon was challengeable for cause because he exhibited a lack of candor in his written response to a questionnaire item concerning prior jury service. Appellant relies on *Franklin v. State*, 138 S.W.3d 351, 354–55 (Tex. Crim. App. 2004), asserting that when a potential juror withholds material information, it suggests bias.

Question 45 of the juror questionnaire asked veniremembers whether they, or their spouses, had ever been jurors in a civil or criminal case. If the venire member checked "yes," the question directed the individual to provide the year and type of case, verdict, punishment amount, and whether the judge or the jury set punishment. Sturgeon checked "yes." He wrote that, while he could not recall the year, he had been a juror in a criminal case in which the jury had acquitted the defendant.

During the State's voir dire, the prosecutor asked Sturgeon about his jury service in the case Sturgeon had listed in response to Question 45. Sturgeon described it as a pedophilia case and stated that the trial lasted three or four days. When the prosecutor asked whether that was his first time serving on a jury, Sturgeon answered, "Something like that. I mean, I served on a traffic violation jury in Garland." Sturgeon subsequently told the prosecutor that his service on the traffic violation case occurred "way before" his service on the pedophilia case. When the defense questioned him, Sturgeon guessed that he might have served on the pedophilia case in the late 1990s.

In challenging him for cause, defense counsel acknowledged that Sturgeon had listed his jury service in the pedophilia case on the questionnaire, but noted that Sturgeon had not included his service in the traffic case. Counsel argued that Sturgeon's failure to list his traffic-case service on the questionnaire reflected a lack of candor and suggested that he would automatically vote for the death penalty.

Appellant's reliance on *Franklin* is misplaced. *Franklin* concerned the standard of

harm an appellate court should apply when a trial judge erroneously denies a mistrial that the defendant sought on the grounds that a juror withheld material information during voir dire. *Id.* at 355. In that context, we noted our previous holding that, "where a juror withholds material information during the voir dire process," the Sixth Amendment is implicated because "the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." *Id.* at 354 (citing *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. [Panel Op.] 1978)).

Sturgeon did not withhold the information about his traffic-case jury service. In fact, Sturgeon volunteered the information during his individual voir dire. Both parties had an opportunity to question Sturgeon on the matter and make informed choices concerning the exercise of their challenges. In addition, it was within the trial judge's discretion to determine that the information was immaterial. *See Franklin v. State*, 12 S.W.3d 473, 477–79 (Tex. Crim. App. 2000).

The record contains sufficient evidence to support the trial court's ruling. The trial court did not abuse its discretion in denying Appellant's challenge for cause to Sturgeon based on his alleged lack of candor on the juror questionnaire. Point of error twenty-six is overruled.

### G. Johnlouis

Defense counsel argued that Johnlouis's response to his hypothetical showed that she would automatically assess the death penalty. Counsel also asserted that Johnlouis

would elevate Appellant's burden of proof regarding the insanity determination because she would require him to present an expert in support of an insanity defense. We find no abuse of discretion because the record of Johnlouis's voir dire supports the trial court's ruling.

During the State's voir dire, the prosecutor explained that Texas law provides two sentencing options for capital murder: (1) life without parole or (2) death. Johnlouis agreed that she believed the death penalty was appropriate "in certain circumstances" but was open to both sentencing options. After exploring topics primarily relevant to the guilt-innocence determination, the prosecutor returned to the subject of punishment and Johnlouis's ability to answer the special issues based on the law and evidence, even if it meant that a death sentence would result. Johnlouis stated that she would be comfortable participating in a process that could result in a defendant receiving a death sentence, but Johnlouis repeatedly emphasized that her answers to the special issues would depend on the evidence. Johnlouis also asserted that her answers to the special issues would not be dictated by the fact that the jury had found Appellant guilty of capital murder.

During Appellant's voir dire, defense counsel presented Johnlouis with a hypothetical, asking her to assume that she sat on a jury that had just found a defendant guilty of capital murder. Counsel emphasized that by finding the defendant guilty, the jury had necessarily determined that the defendant had "[k]nowingly and intentionally caused the death of two people. All right. Meant to do it, intended to do it. It wasn't a mistake. It

wasn't an accident. The person wasn't insane, okay?" Following that introduction, defense counsel asked Johnlouis to tell him "what [her] thoughts are on the death penalty at that point." Johnlouis responded, "Again, I have to hear --" before being cut off by the prosecutor, who objected that defense counsel had asked an improper commitment question. After the court overruled the objection and defense counsel asked for Johnlouis's answer, she asked him to "[g]ive [her] the question . . . again. There's so much going on." Counsel repeated the hypothetical, again emphasizing what the jury had necessarily determined by finding the defendant guilty and asking for Johnlouis's "thoughts . . . on the death penalty at that point." Johnlouis answered, "The death penalty because he did it, you know, and there was no -- he did it."

Apparently believing that Johnlouis did not understand the issue or his question, defense counsel explained the differences in the jury's inquiry at the guilt-innocence phase versus the punishment phase of trial, focusing on the special issues. He then presented the hypothetical again:

> [DEFENSE]: And what were your thoughts on the death penalty at that point?
>
> [JOHNLOUIS]: And Special [Issue] Number 1 has been --
>
> [DEFENSE]: No, I'm just saying -- that's what I'm saying, you're just at the guilt/innocence portion, okay?
>
> [JOHNLOUIS]: I'm just at the guilt/innocence?
>
> [DEFENSE]: Yeah, you found the person guilty of capital murder.

[JOHNLOUIS]: Guilty? Okay.

[DEFENSE]: Okay. So what would your thoughts be on the death penalty at that point?

[JOHNLOUIS]: Again, if they -- if he's guilty or she's guilty, then if they're imposing the death penalty, then they'll impose the death penalty, I guess.

[DEFENSE]: So your belief is that at that phase of the trial the person ought to get the death penalty, is that your position?

[JOHNLOUIS]: Yeah. Yeah.

Defense counsel then abandoned his hypothetical and proceeded to discuss Special Issue

Number 1:

[DEFENSE]: Okay. And so when you're going through that special issue, would you agree with me that you would have to be convinced beyond a reasonable doubt that this defendant would commit criminal acts of violence that would constitute a continuing threat to society, correct?

Would you agree with me on that?

[JOHNLOUIS]: Again, I need to hear, you know, more than just he's -- you know, what he did. I mean what happened, you know, the circumstances of what happened.

Johnlouis continued:

[JOHNLOUIS]: I don't think I would say that he would be a threat until I can understand or hear, you know, some of the things that's happening that he did or whatever. I -- I can't make that decision at this point.

[DEFENSE]: And I'm not asking you to make the decision. What I'm trying to --

[JOHNLOUIS]: Would he be a threat? Until I get the evidence, I'm not sure, you know. I have to weigh what's going on with him, you know. I

don't -- and then try to put that into perspective. I'm not sure if he would be a threat to society. I don't, you know --

[DEFENSE]: And that's what I'm getting at.

[JOHNLOUIS]: Yeah.

The record supports a finding that Johnlouis was confused by counsel's hypothetical, which asked for her "thoughts" on the death penalty rather than whether she could follow the law, and that her answers resulted from that confusion. Johnlouis's subsequent statements regarding Special Issue Number 1, and her testimony during the State's voir dire, manifested her understanding that, by law, a death sentence cannot be the automatic consequence of a capital-murder conviction. They similarly manifested her willingness to follow the law. In any event, the trial judge was in the best position to determine whether Johnlouis would set aside her personal views and honestly and truthfully follow the juror's oath. *Burks*, 876 S.W.2d at 893. We defer to his determination.

We next consider Appellant's assertion that Johnlouis would elevate his burden of proof by requiring him to present an expert witness to support his insanity defense. When defense counsel initially began discussing the insanity defense and the applicable burden of proof, he explained that the law did not require Appellant to present expert testimony, and that Appellant could prove his defense solely with lay testimony. Johnlouis stated that she could find Appellant not guilty by reason of insanity based on the testimony of one psychologist, if she believed the testimony and it established legal insanity by a

preponderance of the evidence. Johnlouis also stated that she could find Appellant not guilty by reason of insanity by a preponderance of the evidence, based on a lay witness's testimony and without expert testimony. But when defense counsel began to transition to another topic, Johnlouis asked for clarification regarding the means by which Appellant could prove legal insanity. Defense counsel explained again that Appellant could prove his defense only with lay testimony, if he wished. Afterward, Johnlouis stated that she understood and had no problem with a lack of expert testimony.

Defense counsel later asked Johnlouis if she had any questions. Johnlouis expressed some difficulty with the idea of Appellant proving insanity solely through lay testimony: "I don't quite agree -- I mean, understand, maybe. I don't agree with the non-expert delivery. That's a problem with me, yeah." She continued,

> [JOHNLOUIS]: You know, I -- personally, I feel that you have to have somebody -- I mean, a cousin or somebody --
>
> [DEFENSE]: Okay.
>
> [JOHNLOUIS]: -- saying that they're insane or whatever.
>
> [DEFENSE]: So you're saying that you would need an expert there?
>
> [JOHNLOUIS]: I think I would probably want one, you know, just to, you know, and run tests or whatever on the --
>
> [DEFENSE]: And -- and --
>
> [JOHNLOUIS]: Yeah, because, you know, you can't just have me --
>
> [DEFENSE]: And that's –

[JOHNLOUIS]: -- come up and say I'm crazy when I'm not.

Defense counsel explained the law again and referred to Johnlouis's earlier assertion that she could find Appellant not guilty by reason of insanity if he proved it by a preponderance of the evidence through a lay witness. Counsel told Johnlouis that if her answer had changed, then she needed to tell him. Johnlouis responded, "[I]f that's what the law says, then we have to follow the law, you know, so that's why I said I could do it. But just because the law -- not that I agree with it, but because of the law." When counsel continued to press her on the point, Johnlouis stated, "Well, I -- I just said -- I don't -- I personally don't agree with that but, you know, if that's the law, that's the law, you know." In further discussion, Johnlouis was emphatic about her ability to set aside her personal disagreement and follow the law, now that she understood it.

To the extent that Johnlouis gave inconsistent or unclear statements, the trial court was in the best position to determine whether she would set aside her personal views and honestly and truthfully follow the juror's oath. *Id.* We defer to its determination. Point of error twenty-seven is overruled.

### *H. Tyler*

Appellant argues that Tyler was challengeable because (1) she would require an expert to testify in support of an insanity defense, and (2) she would impose a higher burden of proof than the law required regarding the insanity determination. The trial court did not abuse its discretion in overruling Appellant's challenge for cause on these bases.

During the State's voir dire, the prosecutor informed Tyler that Appellant might raise an insanity defense at trial. The prosecutor explained the definition of legal insanity, Appellant's preponderance burden of proof, and that Appellant need not present expert testimony or a certain number of witnesses. Tyler unequivocally stated that she could follow the law in deciding whether Appellant was not guilty by reason of insanity.

The exchange that formed the basis of Appellant's challenge to Tyler came at the end of the defense's voir dire when defense counsel directed Tyler's attention to Question 38 of the juror questionnaire. Question 38 informed potential jurors that a person with mental illness can receive life without parole or the death penalty for capital murder and asked veniremembers what they thought. Tyler had written, "I don't know about that[,] sometime[s] I think they [know] what they are doing." When defense counsel asked Tyler what she meant by her answer, she explained,

> [TYLER]: Sometimes people are mentally ill but they -- sometimes they be in their right mind and I think sometimes they know what they be doing, and then sometimes if they're not on their medication, they don't know.
>
> [DEFENSE]: Well, would you -- you're -- I think that -- that -- let me ask you, would you be able to listen to evidence about the insanity defense and if you believed that [Appellant] . . . was insane at the time of the offense, would you be able to say not guilty by reason of insanity?
>
> [TYLER]: If you prove it to me.
>
> [DEFENSE]: What kind of -- of proof would you be looking for in a -- in an insanity defense, do you know?
>
> Do you have any idea about that?

[TYLER]: I think that you would have to have an expert witness to testify or something to say that he's insane, something showing that he wasn't on his medication at the time or if he's on medication.

      I mean, you have to prove to me that he was insane.

[DEFENSE]: Would we have to prove that to you more than as it was explained to you, more than [by] a preponderance of the evidence?

[TYLER]: I think so.

Defense counsel concluded his voir dire directly thereafter and challenged Tyler for cause based on the exchange set forth immediately above. After hearing the parties' arguments for and against the challenge, the trial court recalled Tyler to the stand and questioned her directly:

[COURT]: [Y]ou understand that the law requires that they prove [insanity] by a preponderance of the evidence, --

[TYLER]: Yes, right.

[COURT]: -- okay?

      And you understand that's the law.

[TYLER]: Right.

[COURT]: Now preponderance of the evidence is not as great a burden as beyond a reasonable doubt.

      You understand that?

[TYLER]:    (Nods head.)

[COURT]: In fact, one of the attorneys said, you know, 50.1 percent to 49.9 percent, or whatever you want to -- just barely tipping the scale one way or another.

[TYLER]: Right.

[COURT]: That's the burden of proof that the defense has to prove to you . . . [that] the defendant's insane -- [was] insane at the time of the offense.

And when [the prosecutor] was talking to you, you said [y]es, you understood that and you could.

And I think you gave [defense counsel] a different answer, in that you said, well, you would require more of a burden of proof from the defense than a preponderance of the evidence. I mean, [those weren't] your exact words, but that's what you indicated.

Is that the way you feel?

Now that you know what the law is, can you follow the law or would you require them [to meet] a higher burden of proof than the law imposes?

[TYLER]: No, I could follow the law. If he proved that to a certain degree that --

[COURT]: By a preponderance of the evidence.

[TYLER]: Right. That he was insane at the time?

[COURT]: Yeah.

[TYLER]: I could go along with that.

[COURT]: Okay.

[TYLER]: I could follow the law.

The trial court thereafter denied the challenge for cause.

We find no abuse of discretion. To the extent Tyler gave contradictory answers

concerning her ability to apply a preponderance standard to Appellant's insanity defense

and whether she would require Appellant to present expert testimony, the trial judge was in the best position to determine whether she would set aside her views and honestly and truthfully follow the juror's oath. *Burks*, 876 S.W.2d at 893. The trial judge was entitled to believe Tyler when she told him that she could and would follow the law; we defer to that belief. *See Gonzales*, 353 S.W.3d at 836 n.7. Point of error twenty-eight is overruled.

*I. Sowden*

Appellant challenged Sowden on the grounds that she would automatically vote for the death penalty and hold the defense to a higher burden of proof than the law required on the issue of insanity. The trial court did not abuse its discretion by denying Appellant's challenge to Sowden on these grounds.

Regarding the allegation that Sowden would automatically assess the death penalty, Appellant relies on a response she gave during the State's voir dire. He asserts that Sowden stated she would be "inclined" to assess the death penalty if a person were found guilty of a capital murder involving the killings of two people. *See* TEX. PENAL CODE § 19.03(a)(7). Appellant acknowledges that Sowden went on to say that she would listen to all the evidence, but he contends that her initial response reflected her true feelings. We find no abuse of discretion, as the record supports the trial court's ruling.

Before Sowden made the statement at issue, the prosecutor had begun to explain the law concerning capital murder. Sowden stated that she had previously assumed that a capital-murder conviction automatically meant a death sentence. After learning more

about capital-sentencing procedures, however, Sowden denied believing that everyone

convicted of capital murder should automatically receive the death penalty, no matter

what the punishment-phase evidence might show.

The prosecutor then asked Sowden to assume that she sat on a jury that had found

a defendant guilty beyond a reasonable doubt of a capital murder involving the deaths of

two people. The prosecutor emphasized that the jury had, therefore, necessarily found that

the killings were not accidental, but intentional. He asked Sowden, "And are you

automatically going to assess the death penalty or will you listen to the next phase of trial

and honestly apply those questions and see where the answer takes you?" Sowden replied,

"I might have some idea, but I will listen to the facts," and, "That's what will lead me."

Appellant relies on Sowden's statement, that she "might have some idea," to

support his argument that she would automatically assess the death penalty. But the

prosecutor continued to question Sowden on this subject and obtained several definitive

answers that she would not automatically assess a death sentence. Sowden expressed her

belief in the integrity of the sentencing process and her willingness to maintain it,

asserting that she could "listen to everything and then . . . make [her] decision on what

[she] listened to." When defense counsel asked Sowden what she had meant when she

told the prosecutor that she had "some idea," Sowden responded, "Some idea -- what

you're talking to me about is I have no facts yet on this case, so that's when I say, I have

an idea what I would do, but I cannot tell you until I have all the facts exactly what I will

do." Sowden further explained, "If I have all the facts and I believe someone is guilty, then I will go into it with those beliefs. I won't have an idea at that point. I won't -- it's hard for me to say without knowing all the details." She asserted again that her answers to the special issues would not be automatic: "When I walk in there, I will not say, [t]his person should die. I mean, it could be life. I mean, when I step into the second part of this -- after I hear everything, I can tell you."

The entirety of Sowden's voir dire shows that she made several unequivocal assertions that she would not automatically vote for a death sentence but would consider all the evidence and follow the law. To the extent any of her answers on that issue were unclear or ambiguous, the trial court was in the best position to evaluate her demeanor and responses. *Davis*, 329 S.W.3d at 807. We defer to the trial court's ruling.

We next turn to Appellant's contention that Sowden would hold Appellant to a higher burden of proof on the insanity determination. During the State's voir dire, the prosecutor explained the concept of legal insanity and Appellant's burden of proof. Sowden stated that she could find Appellant not guilty by reason of insanity if he proved insanity by a preponderance of the evidence. Sowden also stated that she could find Appellant not guilty by reason of insanity on the testimony of one or several witnesses, so long as the testimony convinced her by a preponderance of the evidence that Appellant was insane at the time of the offense.

During Appellant's voir dire, defense counsel also asked Sowden whether, if the

defense proved insanity by a preponderance of the evidence through one witness, she would have a problem finding Appellant not guilty by reason of insanity. Sowden answered that she "would factor it in, certainly." After explaining the preponderance standard again, counsel repeated the question. Sowden responded, "If I believe that person is a credible witness. I mean, if that person speaks to me in a manner that I believe that person, then yes, I will believe he's insane."

Defense counsel argued that Sowden's use of the word "credible" and her intonation when saying it meant that she would elevate Appellant's burden of proof. Noting that credibility was part of the preponderance standard's definition, the trial judge denied the challenge. We find no abuse of discretion, as we have defined preponderance of the evidence as the greater weight of credible evidence that would create a reasonable belief in the truth of the claim. *See Druery v. State*, 412 S.W.3d 523, 540 (Tex. Crim. App. 2013). Further, the trial judge was in the best position to evaluate Sowden's demeanor and responses. *Davis*, 329 S.W.3d at 807. Point of error thirty is overruled.

### *J. Evans*

Defense counsel challenged Evans for cause on three grounds: (1) she would automatically assess the death penalty, (2) she could not consider evidence about genetics in answering the mitigation special issue, and (3) she did not understand and could not follow the law regarding Appellant's preponderance burden on insanity. The trial court did not abuse its discretion in denying Appellant's challenges for cause to Evans.

Counsel based his first two reasons for challenging Evans on her juror questionnaire answers. Counsel argued that, although Evans stated during voir dire that she would change her questionnaire answers now that she had been educated about the law, her demeanor led him to believe that she still held the views expressed in her questionnaire and could not follow the law. Appellant does not direct us to any instance from Evans's voir dire in which she indicated that she understood the law, but she held contrary personal views that she could not set aside, nor does our review reveal any. As to her demeanor during voir dire when questioned about these issues, the trial judge was in the best position to evaluate it, and we defer to his determination. *Id.*

Regarding the challenge related to his burden of proof on the insanity determination, Appellant relies on an exchange that occurred during the defense's voir dire. When the prosecutor initially defined legal insanity and explained Appellant's preponderance burden of proof, Evans stated that she could find Appellant not guilty by reason of insanity if the defense proved insanity by a preponderance of the evidence, even if the evidence came through one witness. Evans also stated that she would not hold Appellant to a higher burden than the preponderance standard. Near the end of Appellant's voir dire, defense counsel also defined legal insanity and explained Appellant's burden of proof. Counsel then gave Evans a hypothetical in the following exchange:

> [DEFENSE]: Okay. If whatever evidence was brought to you, even if it was by one person, and the State did prove -- I mean the defense, excuse me, I

misstated. -- the defense proved this defense of insanity by a preponderance of the evidence, your verdict would be what?

[EVANS]: If the State did prove?

[DEFENSE]: No, I misstated.

[EVANS]: I mean if the defense did prove?

[DEFENSE]: Let's start over, okay?

[EVANS]: Okay.

[DEFENSE]: Because I think I screwed it up. I explained the burden of proof. This table has the burden of proof on insanity.

[EVANS]: Okay.

[DEFENSE]: The burden of proof is by a preponderance of the evidence. If we, by one witness or whatever the witness says, and you believe this witness by a preponderance of the evidence and the defense has met that burden in your mind, what would your verdict be or what would you vote for?

[EVANS]: I guess the insanity one?

[DEFENSE]: Uh-huh. You could find somebody not guilty by reason of insanity?

[EVANS]: Yes.

Defense counsel argued that Evans's demeanor during the foregoing exchange was "very inquisitive," as if she "wasn't sure" and wanted someone to tell her how to respond. The State countered that it had been clear that Evans was simply confused due to defense counsel's initial misstatement. The trial judge, who was in the best position to assess Evans's demeanor and responses, denied the challenge. We defer to his decision. *Id.* Point

of error thirty-one is overruled.

### K. Matthews

Defense counsel argued that Matthews "hesitated" during voir dire questioning, which indicated that she could not follow the law on insanity and would hold the defense to a higher burden than the law required. Appellant directs us to Matthews's response when the prosecutor asked whether she could find Appellant not guilty by reason of insanity based on the testimony of one witness. Although Matthews answered, "Yes," the prosecutor indicated that he perceived some hesitation in her response. When he asked whether the hesitation was because the decision would be distasteful, Matthews answered, "No," but stated that "it [would] take great pondering." She continued, "It's not going to be a quick decision, in other words."

The trial court did not abuse its discretion in denying the challenge for cause. Matthews's reference to "pondering" and subsequent clarification did not unequivocally establish an inability to follow the law. *See Moore*, 999 S.W.2d at 407. Moreover, when questioned by the defense regarding her ability to find Appellant not guilty by reason of insanity on a preponderance of the evidence, Matthews again asserted that she could do so. Matthews's voir dire sufficiently supports the trial court's ruling. *See Davis*, 329 S.W.3d at 807. Point of error thirty-two is overruled.

### L. Adair

Defense counsel raised three challenges for cause to Adair, all of which the trial

court denied. We find no abuse of discretion.

First, defense counsel argued that Adair would automatically vote for the death penalty. Defense counsel acknowledged that, during the State's voir dire, Adair had indicated that he could and would follow all the law applicable to sentencing, but defense counsel asserted that, during the defense's voir dire, Adair "differentiated and went back and forth and vacillated on his true feelings," such that counsel believed Adair's "true opinion [was] that if somebody kills somebody, that they deserve to die."

After reviewing Adair's entire voir dire, we disagree that he took positions during defense questioning that were materially different than the answers he gave during the State's questioning. But even if we were to accept Appellant's argument, we give particular deference to the trial court's ruling when a prospective juror vacillates or gives equivocal or contradictory answers concerning his ability to follow the law. *Gardner*, 306 S.W.3d at 295.

Second, defense counsel argued that Adair would hold Appellant to a higher burden of proof than the law required regarding insanity. Defense counsel based his assertion on Adair's response when the prosecutor questioned him about his answer to Question 38 of the juror questionnaire. Question 38 informed potential jurors that a person with mental illness can receive life without parole or the death penalty for committing capital murder, then asked for the juror's thoughts. Adair wrote, "Life without parole no death penalty on a person with mental illness." The prosecutor

questioned Adair as follows:

> [PROSECUTOR]: First of all, would you agree with me that anyone can just claim they have a mental illness?
>
> [ADAIR]: Yes.
>
> [PROSECUTOR]: Okay. Would you agree with me that mental illness exists on a range of very mild, like a person with mild depression, all the way up to severe where a person just doesn't even understand the difference between right and wrong?
>
> [ADAIR]: Right.
>
> [STATE]: Okay. Now, are you saying to me that, no matter what the extent of the mental illness is, that you'll never consider the death penalty, or are you saying if they are on a far end of that scale that you wouldn't consider it?
>
> [ADAIR]: No, on a far end.

This line of questioning and Adair's "far end" response concerned a punishment issue rather than the affirmative defense of insanity. Appellant identifies nothing else in Adair's voir dire suggesting that he would elevate the burden of proof regarding the insanity determination, and we find nothing in our independent review.

Third, defense counsel asserted that Adair's testimony when questioned about his written response to Question 17 of the questionnaire showed that he would require any evidence of remorse to come through Appellant's testimony. Question 17 asked jurors what would be important to them in deciding whether a person received a death sentence rather than a life sentence in a capital-murder case. In pertinent part, Adair indicated that a lack of remorse would be significant to him.

The prosecutor informed Adair that a defendant has a constitutional right not to testify and that if the defendant elects not to testify, a juror may not hold that choice against him. Adair stated that he could and would follow the law. When defense counsel questioned Adair, counsel noted his mention of remorse in response to Question 17. Defense counsel asked whether Adair would require a defendant "to actually testify and say, look, I'm sorry I did that, or something like that, in the punishment stage?" Adair said that he would not, but he struggled to explain:

> No, I think the remorse would -- I don't know if that's a state of mind or it goes along with like their moral [culpability]. I think it's, you know, like they have no feeling when they do it, you know, like they are not remorse[ful] about killing another human being.

Defense counsel then suggested that a defendant's testimony might be the only way for him to provide evidence of remorse:

> [DEFENSE]: Okay. Do you see where I'm coming from? To actually -- I mean the way we give information to each other is either through, you know, some kind of gesture, words, or writings.

> [ADAIR]: Right, right, right. I guess --

> [DEFENSE]: And, so, I guess my question is, you know, how would you receive the information about if a person was remorseful, you know, if you didn't require him to testify or give you some information about remorse, like I'm sorry or something?

> [ADAIR]: I guess explaining through the act of violence, I guess that would be --

> [DEFENSE]: Are you saying that, during the act of violence, they would have to say, I'm sorry, or something like [that]?

[ADAIR]: No, just, or their mental, trying to say their state of mind at the time of doing the crime.

[DEFENSE]: Okay. I guess I'm confused. I am totally confused in that sense.

[ADAIR]: I'm a little confused myself.

When defense counsel again asked Adair to explain how one would know whether someone was remorseful or not, Adair responded, "I guess through their actions, maybe you could tell. I don't know, if they were crying or I guess however you could tell whether they are remorse[ful] or not."

It was within the trial court's discretion to deny Appellant's challenge for cause. The proponent of a cause-based challenge must show that the challenge is proper and does not meet this burden until, among other things, he demonstrates that the law was explained to and understood by the venire member. *Davis,* 329 S.W.3d at 807. When the prosecutor explained a defendant's constitutional right not to testify, Adair stated that he could and would follow the law. When defense counsel discussed the topic, it was in the context of how jurors could ascertain whether a defendant felt remorse. Defense counsel did not explain to Adair that jurors could determine whether a defendant felt remorse at the time of the offense by drawing reasonable inferences from circumstantial evidence presented at trial. *See Snowden v. State*, 353 S.W.3d 815, 823–24 (Tex. Crim. App. 2011). Rather, it seems that counsel inaccurately implied through his questions that only the defendant, by testifying, could supply such evidence. Despite the apparent misdirection,

Adair evinced an understanding that circumstantial evidence may provide a basis for inferring remorse. Appellant points to nothing in the record to show that Adair could not or would not consider such circumstantial evidence, if it were offered, or that he would require evidence of remorse to come from Appellant himself. Point of error thirty-four is overruled.

### M. Koshy and Newton

Because Appellant received two additional peremptory strikes, he can demonstrate harm only by showing that the trial court erroneously denied at least three of his challenges for cause to the seventeen veniremembers at issue in points of error eighteen through thirty-four. *See Chambers*, 866 S.W.2d at 23. We have reviewed Appellant's challenges for cause to fifteen of those potential jurors and found no error by the trial court. Accordingly, even if we assume that the trial court erred in denying Appellant's challenges for cause to the two remaining veniremembers at issue, Koshy and Newton, Appellant cannot show harm on appeal. *See id.* Points of error nineteen and twenty are overruled.

### VIII. VOIR DIRE—REMAINING POINTS OF ERROR

In point of error thirty-five, Appellant alleges that the trial court erred by not permitting defense counsel to ask venire member Morgan about the types of evidence she might consider mitigating. During the State's voir dire, the prosecutor explained to Morgan that jurors must be able to consider all of the evidence, including evidence of the

victims' experience of the offense, when answering the mitigation special issue. *See* Art. 37.071, § 2(e)(1). When questioning Morgan, defense counsel referred to the State's point about considering the victims' perspective. Defense counsel asserted that evidence concerning the victims' experience of the offense could have mitigating or aggravating value. Defense counsel asked Morgan if she could foresee circumstances in which such evidence could be mitigating. After Morgan responded that she could, defense counsel asked her to give examples, at which point the State successfully objected.

We review a trial court's ruling that limits voir dire questioning for an abuse of discretion. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012). Appellant acknowledges that we have previously held that questions such as the one defense counsel posed are improper. *See id.* ("Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry."). To the extent Appellant argues that our precedent is inconsistent with the holding of *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), we disagree. *Lockett*'s holding requires that the sentencer in a capital case not be precluded from considering, as a mitigating factors, any aspect of the defendant's character, record, or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.* at 604. We see nothing in *Lockett* that permits a defendant to ask a prospective juror the kind of question that Appellant sought to ask Morgan. The trial court did not abuse its discretion. Point of error thirty-five is overruled.

In point of error thirty-six, Appellant alleges that the trial court erred during voir

dire when it allowed the prosecutor to misstate the law concerning the future-dangerousness special issue. The alleged misstatements occurred during the State's questioning of veniremembers Johnlouis and Evans.

The future-dangerousness special issue requires jurors to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). The record shows that the prosecutor focused on the implications of the words "would" and "threat" in the special issue. The prosecutor asserted that the future-dangerousness special issue asks jurors to consider what threat the defendant's "mere existence" would pose, even assuming the possibility that he "would sit in his cell every day and never commit a criminal act of violence." Alternatively, the prosecutor explained that the special issue asks jurors to consider whether the defendant "would" commit criminal acts of violence that would constitute a continuing threat to society, "if he could." After the prosecution rephrased the question, the trial court overruled Appellant's objections that the prosecutor's statements still misstated the law.

We have previously construed the future dangerousness issue as focusing on an individual's character for violence and his internal restraints, rather than merely the external restraints of incarceration and likelihood of incapacitation. *See*, *e.g.*, *Coble*, 330 S.W.3d at 268–69; *Estrada v. State*, 313 S.W.3d 274, 281–82 n.5 (Tex. Crim. App. 2010). The prosecutor's statements were generally consistent with this. Accordingly, we

conclude that the trial court acted within its discretion in overruling Appellant's objections. Further, the record shows that neither Johnlouis nor Evans served on Appellant's jury. Thus, even if we were to determine that error occurred, it did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Point of error thirty-six is overruled.

### IX. CONSTITUTIONAL CHALLENGES TO ARTICLE 37.071

In point of error thirty-seven, Appellant argues that Article 37.071, section 2(f)(4), violates the Eighth and Fourteenth Amendments to the United States Constitution because it limits the jurors' consideration to evidence that implicates the defendant's moral blameworthiness. In point of error thirty-eight, Appellant asserts that Article 37.071 violates the Eighth and Fourteenth Amendments because it does not provide a burden of proof regarding the mitigation special issue. In point of error thirty-nine, Appellant contends that the "10-12" provision found in Article 37.071, sections 2(d)(2) and (f)(2), violates the Eighth and Fourteenth Amendments because it misleads the jury. In point of error forty, Appellant alleges that Article 37.071, section 2(f)(4), violates the Eighth Amendment because it does not require the jury to consider mitigating evidence, and for the same reason, the trial court's jury instruction pursuant to Article 37.071, section 2(f)(4), also violated the Eighth Amendment. In point of error forty-one, Appellant contends that Article 37.071, section 2(a), violates the Eighth and Fourteenth Amendments because it prohibits the jury from being informed about the consequences of

a single holdout juror. In point of error forty-two, Appellant asserts that Texas's capital sentencing scheme violates the Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 583 (2002). In point of error forty-three, Appellant avers that Article 37.071, section 2(b)(1), violates the Eighth and Fourteenth Amendments because it does not define the terms "probability," "continuing threat to society," "criminal acts of violence," and "continuing threat." In point of error forty-four, Appellant alleges that Article 37.071 violates the Supreme Court's holding in *Bush v. Gore*, 531 U.S. 98 (2000), because it does not provide a method by which the state determines a defendant's death-worthiness.

Appellant acknowledges that we have previously rejected claims identical to points of error thirty-seven through thirty-nine and forty-one through forty-three. *See, e.g.*, *Coble*, 330 S.W.3d at 296; *Williams*, 301 S.W.3d at 694; *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007). Although Appellant fails to mention controlling precedent from this Court, we have previously rejected the claims he raises in points of error forty and forty-four. *See, e.g.*, *Lucero v. State*, 246 S.W.3d 86, 102 (Tex. Crim. App. 2008); *Saldano v. State*, 232 S.W.3d 77, 108–09 (Tex. Crim. App. 2007). Appellant's arguments do not persuade us to revisit these issues. Points of error thirty-seven through forty-four are overruled.

We affirm the judgment of the trial court.

Hervey, J.

Delivered: February 25, 2015

Do Not Publish